## Case No. 14,441.

### UNITED STATES v. AMES.

[1 Woodb. & M. 76;[1] 9 Law Rep. 295.]

Circuit Court, D. Massachusetts. Oct. Term, 1845.

UNITED STATES—OWNERSHIP OF LAND—CESSION—MILL DAMS—BACK-FLOWING WATER—AWARD—OFFICER.

1. Where the United States own land, situated within the limits of particular states, and over which they have no cession of jurisdiction, for objects either special or general, the rights and remedies in relation to it are usually such as apply to other land owners within the state, and the lex rei sitæ will govern; except where the

---

[1] [Reported by Charles L. Woodbury, Esq., and by George Minot, Esq.]

constitution, treaties or statutes of the United States, otherwise require and provide.

[Cited in Moan v. Wilmarth, Case No. 9.686; Passenger Cases, 7 How. (48 U. S.) 538.]

[Cited in Re O'Connor, 37 Wis. 384.]

2. The territory belonging to the United States, not situated within the limits of any state, and also that within such limits, but over which jurisdiction has been ceded to the United States, and which is used for exclusive and constitutional objects, are subject to the laws of congress, and not to those of the state, when conflicting in any degree with what has been required by the general government.

[Cited in Perry Manuf'g Co. v. Brown, Case No. 11.015: Ex parte Tatem, Id. 13.759; Van Brocklin v. Tennessee, 117 U. S. 176, 6 Sup. Ct. 684.]

3. The United States, in cases where congress has not provided any or adequate remedies for injuries to public property, may resort to those of common law origin, or those provided by the laws of the several states.

[Cited in Clark v. Sohier, Case No. 2.835; U. S. v. New Bedford Bridge, Id. 15.867; Perry Manuf'g Co. v. Brown, Id. 11,015.]

4. But in a place over which jurisdiction has been ceded to the United States, the state laws cannot be permitted to thwart or embarrass the object of the cession.

[Cited in U. S. v. Chicago, 7 How. (48 U. S.) 195.]

5. It seems, that the laws of Massachusetts respecting flowage, do not apply to the case of machinery used by the United States for public purposes, in a place over which jurisdiction has been ceded to the United States, so as to authorize a mill owner to flow back in a way to impair in any degree the use of the machinery.

[Cited in Harding v. Funk, 8 Kan. 221.]

6. It seems, also, that those statutes were not intended to authorize the flowage back upon public lands of the United States.

7. Whether an award, made under a parol agreement to refer, and not under a rule of court, nor by a submission under a statute provision, nor under bonds, with penal provisions to enforce its execution, can be pleaded in bar to any action, unless previously accepted, or carried into effect, —quære.

8. No officer of the United States has authority to enter into a submission in their behalf, which shall be binding on them, unless the power is given by a special act of congress.

9. The United States had machinery in operation, carried by water, on land which had been sold to them, and over which jurisdiction had been ceded to them, by the state of Massachusetts. A. owned mills above and below them, on the same stream: and the dams of each party flowed back so as to obstruct the other. A submission of the matters in dispute was entered into by A. on the one part, and by the district attorney, authorized by the solicitor of the treasury, or war department, on the other part, but without any authority from congress; and an award was made thereon, prescribing the height of the dam. The United States afterwards brought an action of trespass against A. for flowing their land. He pleaded a special bar of the award, alleging that he had complied with its terms. On general demurrer, it was *held*, that the special plea could not be sustained.

[Cited in Head v. Amoskeag Manuf'g Co., 113 U. S. 9, 5 Sup. Ct. 448.]

[Cited in Holyoke Water-Power Co. v. Connecticut River Co., 52 Conn. 575.]

This was an action of trespass on the case, brought by the United States against the defendant [David Ames] for flowing land of

theirs, situated in Springfield, over which jurisdiction had been ceded to them by the state of Massachusetts. The writ was sued out, April 26, 1843. The general issue was pleaded, and a special bar of an award, which was averred to have been made under a submission between the United States and the defendants, September 24, 1841. The plea sets out the whole submission as entered into by Franklin Dexter, district attorney of Massachusetts, stated to be "authorized for that purpose," of the one part, and claiming that Ames had erected his dam so high as to flow back water on the plaintiffs, and injure them: and Ames, on the other part, claiming that the United States had done the same to him as owner of other works situated above them, and agreeing that the decision of the arbitrators be final. The plea then avers a hearing before them, and a decision June 27, 1842. The decision was set out in full; and among other things found that both parties, by recent dams, had flowed the water back on each other higher than before, and to each other's injury; and ordered that Ames' dam be reduced in height so as not to flow back enough to obstruct the wheels of the United States; but that he might continue, as he does now, to flow back on the land of the United States, paying damages as assessed, "agreeably to the provisions of the laws of Massachusetts." It is not necessary to repeat other particulars in the award as set out; but the plea proceeded to aver that the award covers the claim now sued for; and that Ames had offered and been ready to fulfil it on his part, and had done all in his power to perform it before the commencement of the present action. To this plea there was a general demurrer.

R. Rantoul, Jr., U. S. Dist. Atty., and Charles L. Woodbury, for the United States.

B. R. Curtis, for defendant.

Points, by the counsel of the United States: That the award was not made under a rule of the court, but was voluntary. That the award was bad, because made in pursuance of the laws of Massachusetts. Because the statutes under which it was made referred only to grist mills. That the award was in violation of the uses recited in the act of congress directing the purchase of the territory. That the title to the soil and the jurisdiction being both in the United States, the award was bad, because not authorized or confirmed by an act of congress. That the award was bad, because the executive of the United States had no authority to vest, by submission or otherwise, judicial powers, otherwise than according to article 3, § 1, of the constitution of the United States.

On the part of the defendant it was argued: That the award was correct in taking the law of Massachusetts as its rule. 1 Stat. 92, c. 20, § 34. That the rights, powers, and duties of ownership of land, were

derived from the lex rei sitæ. That the statutes were declaratious of this rule, and had not been changed by the United States since the cession. The United States, as a general proposition, were subject to the same rules as citizens, as laud owners. That if this action had been between citizens of Massachusetts, the award would be good. That the rights of the United States government in the premises were similar to the common law rights of prerogative in the king. That at common law, all rules of property which do not trench on some legal, fixed prerogative, bind the king. That the United States courts have gone far to sustain this doctrine.

WOODBURY, Circuit Justice. It was admitted in the argument of this case, that the referees intended to decide the claims of the parties according to law. In that event, the award can probably be examined, and its legality be considered by courts of law, when it is pleaded in bar to an action, as is done in the present instance. Power Co. v. Gray, 6 Metc. (Mass.) 131; Kyd. Awards, 351; Jones v. Frazier, 1 Hawks, 379; Greenough v. Rolfe, 4 N. H. 357.

The objections, relied on chiefly against the validity of the award, are; first, that the referees conform their decisions to the special laws of Massachusetts, rather than those of a general character, or those of the United States, applicable to their public domain; or to property they own for public purposes, such as arsenals or armories; and over which jurisdiction has been ceded to them. Secondly, that if their rights and remedies as to such property as this are to be regulated by the laws of Massachusetts, the special statutes as to damages for flowing by mill-owners are not designed for machinery or property used for such purposes as that at the Springfield armory. And lastly, that no authority exists by the laws of the United States, for any officer to enter into a submission, so as to bind the government to fulfil any award made thereon.

In relation to the first objection, it is material to notice, that not only the title to the soil where the injury has been done by the defendant, of which the United States complain, is in the latter, but the jurisdiction over it. Some of the deeds of the land were executed as early as September 19, 1798; and the cession of jurisdiction of a mile square, including the premises, was made by the state of Massachusetts in the same year. See St. Mass. 1798, c. 13, § 2. It is to be observed farther, that the purchase, cession and use of this land have been for a peculiar and exclusive public object, namely, the manufacture of arms. The acts of congress have authorized such establishments to make firearms; and the use of the latter for the public troops as well as for "arming" the militia of the states, is an important and constitutional object, and one that should be under the control of the United States. See Const. U. S. art. 1, § 8. Congress, as early as April 20, 1794, authorized the erection of arsenals and magazines connected with this object. In 1796, the president was expressly empowered to purchase lands for armories; and all the purchases at Springfield, and the deeds of cession, with their dates, will be found enumerated in Com. v. Clary, 8 Mass. 72. Where the United States own land, situated within the limits of particular states, and over which they have no cession of jurisdiction, for objects either special or general, little doubt exists, that the rights and remedies in relation to it are usually such as apply to other land-owners within the state. It may be considered a general axiom in the title and transfers of real estates, that the lex rei sitæ governs as to non-residents, no less than residents and citizens. U. S. v. Crosby, 7 Cranch [11 U. S.] 115; Johnson v. M'Intosh, 8 Wheat. [21 U. S.] 543, 572; Kerr v. Moon, 9 Wheat. [22 U. S.] 565; 10 Wheat. [23 U. S.] 192. It governs also, as to remedies. Robinson v. Campbell, 3 Wheat. [16 U. S.] 212, 219. So the government, as a mere proprietor, must in most respects be treated like other proprietors, as to all servitudes, easements and other charges. Story, Confl. Laws, § 447. The laws of each state, too, so far as applicable, govern the decision, whoever may be the parties, in trials at common law, of questions in this court as well as in the several state courts, with an exception, which is pointed out in the judiciary act of 1789 [1 Stat. 73]. See section 34, c. 20. The exception is "where the constitution, treaties or statutes of the United States shall otherwise require or provide." And it is by force of these principles and analogies that the United States, if holder of a bill of exchange, must, in the absence of any law of congress on the subject, use the diligence and comply with the forms that are required of other parties. U. S. v. Barker [Case No. 14.520]; 12 Wheat. [25 U. S.] 561. So in its liability to damages on foreign bills of exchange. Bank of U. S. v. U. S., 2 How. [43 U. S.] 711. So in respect to its bonds (3 Story, Const. 200), and suits on the same (Dixon v. U. S. [Case No. 3,934]). And also its liability to a general average, when having property on board a vessel where a loss occurs, to save the cargo. U. S. v. Wilder [Id. 16,694]. So in respect to alluvion, or land deposits. New Orleans v. U. S., 10 Pet. [35 U. S.] 662, 717–719. So as to a set-off against and suit by the United States. U. S. v. Bank of Metropolis, 15 Pet. [40 U. S.] 377. So in suing on bills of exchange, without any special act of congress regulating the subject. Dugan v. U. S., 3 Wheat. [16 U. S.] 172.

By a careful discrimination, it will be seen that all these rest on a principle, not inconsistent with the idea that the territory belonging to the United States, not situated

within the limits of a state, and that which is within those limits, but over which jurisdiction has been ceded to the United States, and which is used for exclusive and constitutional objects, are subject to the laws of congress, and not to those of the state, when conflicting in any degree with what has been required or provided by the general government. The exception in the judiciary act seems introduced to meet such changes as congress might, from time to time, prescribe, either for others or the United States. It was a knowledge that new laws by congress, and that general rather than local principles must be made applicable to protect and govern such public property in many cases, that probably led to the express provision in the constitution, that "the congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States." Const. U. S. art. 4, § 3, c. 2. This of course means rules or regulations by legislation. Baldw. Const. 85, 86. The laws of the general government, therefore, punish offences, committed within such a jurisdiction ceded to the United States, and not the state laws; and state process cannot run there at all in civil or other cases, but by a special exception or reservation in the cession. The acts of congress also authorize, in certain cases, the removal of intruders on their lands by the marshal of the United States; and these acts have often been sanctioned by high law officers, as lawful on the part of congress. Op. Attys. Gen. p. 107, by Rodney; p. 123, by Rush; p. 1344, by Gilpin. Many will recollect the celebrated exercise of this power by Mr. Jefferson against Mr. Livingston, as to the batture in New Orleans. It is reported in Hall's Law Journal, and an action of trespass for it against Mr. Jefferson may be seen in 1 Brock. 211. The conveyance of lands by Indians, when under the jurisdiction of the United States, if made without their consent, is rendered void by the United States laws. See intercourse law of 1802, March 30 [2 Story's Laws. 83]; 2 Stat. 139. The removal of live oak and cedar from lands reserved for public use for the navy, is likewise prohibited and punished by extraordinary provisions in acts of congress, that have been long approved and their extension to other subjects is recommended by one of the ablest of our attorney-generals. Opinions, 367, by Mr. Wirt.

All these laws are to be vindicated, and are to control any state laws over the territory, though judisdiction of the particular lands in question has not always been ceded to the United States, by the states in which they lie. Op. Attys. Gen. 1397–1399. Because the public lands, held for sale, are held for that special purpose, and can be protected and regulated by congress, by removing intruders, so as to secure that purpose as a public and general one. It is the same in re-

spect to those held for live oak, &c. They are held or are reserved for another specific public object, which might be defeated without particular and controlling legislation by the general government. And as to the Indians within particular states, and on lands the fee of which belongs to the general government, they and their title are under our protection rather than that of the states. All these rights exist in the United States for constitutional purposes, and without a special cession of jurisdiction; though it is admitted that other powers over the property and persons on such lands will of course remain in the states till such a cession is made. Nothing passes without such a cession, except what is an incident to the title and purpose of the general government; but that passes which is an incident, though a special jurisdiction may not have been transferred in so many words. Again, preëmption rights are not allowed on lands reserved for forts or as lead mines, or for cultivating the vine and olive; because they have been appropriated to specific public objects, and are thus taken out of the operation of other laws than those of congress as to such objects. The case of the Baubine claim at Chicago, recently, is well known over the country. See Wilcox v. Jackson, 13 Pet. [38 U. S.] 498; and U. S. v. Gear. 3 How. [44 U. S.] 120, 132.

Next, as to the general remedies for injuries to such property. Besides the statutory remedies given for injuries committed on some public property, the United States possess those common to other holders of property in the courts of the Union, whether of common law origin or otherwise. Opinion of Mr. Wirt, 366, 367. Their remedies in all these cases may be those specially provided by congress, or any others suitable to the case itself, and not conflicting with "the constitution, treaties, or statutes of the United States." And when these last are not full or exclusive in their design, as well as when their absence or inapplicability to the subject renders a resort to others expedient, the remedies to be pursued are those given by the laws of the several states. See the act before cited, and opinion of Wirt, 1388, 1150. Hence trespass, waste, and injunction, as well as the power to remove intruders, given by special acts of congress, exist for remedies.

In the case now under consideration, a cession of jurisdiction is superadded; and the state laws are to aid, and not defeat, the protection of the title of the United States; and to secure the object of the cession, rather than thwart or embarrass it; and whenever they do the latter, they are controlled by the acts of congress and the constitution, obtaining and setting apart this property for special public purposes, which the laws of the state, whether as to remedies or rights, must not be permitted to apply to, so as to destroy or injure. See the opinion of Mr. Butler, 1150, as to West Point. Such places

are under the exclusive legislation of congress, and that legislation controls so far as it goes. But remedies can be sustained under state laws, where congress has not acted so as to take them away; though state laws cannot be interposed to defeat the objects of the reservation. Id. 1151, 1152. If the United States could not enforce these objects in their own courts, and without being subject to defeat or restriction, by provisions made in particular states, either as to the damages or use, the whole object in the reservation, or the special use of such property, might be nullified. Thus, in this case, if the defendant can be protected, under the laws of Massachusetts, in overflowing the lands or machinery of the United States, and in paying damages therefor. only as those laws require, the design in the purchase and cession of jurisdiction for an armory is exposed to be entirely frustrated, and the whole establishment destroyed.

But, it has been held, even in the courts of Massachusetts, that the ordinary laws of the state do not prevail within the territory ceded to the general government. Com. v. Clary, 8 Mass. 72. And see People v. Godfrey, 17 Johns. 225; U. S. v. Bevans, 3 Wheat. [16 U. S.] 336, 388; Cohens v. Virginia, 6 Wheat. [19 U. S.] 264, 364. The states wherein such establishments exist, if jurisdiction over them has been ceded away, do not regard them or their occupants as subject to state control. They cannot vote, or be taxed; nor are they "bound by any of its laws." 8 Mass. 77. It is, in most respects, left to congress, and congress alone, to legislate for those territories, and districts, and places within its exclusive jurisdiction, and provide for its own rights, as well as the rights and duties of others within that jurisdiction, whether in territories, or forts, or public vessels, or any other public establishment. U. S. v. Cornell [Case No. 14,867]. So congress, being general in its powers over certain specified objects, can, through the courts of the United States, enforce all rights acquired for those objects, and can redress wrongs inflicted within its exclusive jurisdiction. Marshall, C. J., in Cohens v. Virginia, 6 Wheat. [19 U. S.] 264, 428. Indeed, it has been adjudged, that congress alone can punish crimes committed in such places. U. S. v. Cornell [supra] 8 Mass. 72. So it has been considered, that states cannot assess and collect taxes within the jurisdiction, or on property ceded to the United States. Wirt's opinion, Sept. 8, 1823. Op. Attys. Gen. p. 469. Nor can they tax the property (Id. p. 101) of the United States situated within their territory, according to another opinion (Id. p. 101, and semb.; Dobbins v. Commissioners of Erie Co., 16 Pet. [41 U. S.] 435), though that question is now before the supreme court of the United States, to be settled judicially, in a case from the state of Maine. Nor can the states pass statutes of limitation affecting the property of the United States held for special purposes. Jourdan v. Barrett, 4 How. [45 U. S.] 169.

In one class of cases, as to forms of process, writs, executions, &c. at common law, in the United States courts, it is true that the laws and forms of the states were expressly adopted in most respects. at first, in 1789, by the act to regulate processes. But they were left subject to change by congress afterwards, and when, in 1792 (1 Stat. 226, 1792, c. 36). they were made perpetual as then existing. it was with an exception of changes that might afterwards be made, from time to time, by said courts, or by the supreme court of the United States. Wayman v. Southard, 10 Wheat. [23 U. S.] 1, 31. And several changes have since been made by congress as to some writs, and imprisonment for debt, appraisers of property, &c. In all these cases, the state laws must yield to those made by congress, if any are so made, whether as to forms or remedies, when actions are brought in the courts of the United States. Livingston v. Jefferson [Case No. 8,411]. Nor is this conclusion at all inconsistent with the general axiom, that the lex rei sitæ, whether as to rights or remedies. governs as to real estate; for here the land is situated not within the jurisdiction and control, or government of Massachusetts, but within that of the United States. In another view, as an exception to the general principle, if necessary to establish an exception, it seems highly reasonable, and is sustained by various analogies, that no special law of a state shall be applied to property so situated, if at all endangering the use or object for which it is held by the United States. The inclination of my mind would, therefore, be strong against the legality of applying the special act of Massachusetts, for flowing land, to this case, if it had been allowed by the arbitrators to remain flowed. so as to impair at once and in any degree the use of the machinery on these premises for an armory. But as it does not remain so under the award. I do not feel justified in holding the award void on account of this reason: yet as it is supported under the next head by other reasons. which seem to exempt the whole cession from the operation of any peculiar local laws, and to protect any public privilege or right from the flowing acts, it is very questionable whether the arbitrators should have allowed any encroachment whatever in this case, even on the land, to have been continued by virtue of those acts. My impression is, they should not, and I have examined this point at more length than would otherwise have been done. as the case can be disposed of on the last point alone. because, if not settled now, it must be at the trial of this very cause on the general issue. where the flowing acts would be probably urged as furnishing the guide and rule in respect to damages.

Let us then proceed to the second objection, and in the course of it. see more as to the force of the other considerations in favor

of the first objection. The second is, that the laws of Massachusetts, as to flowing, do not in their spirit apply to cases like this. The origin of those laws, was doubtless to encourage and sustain grist and saw mills, and not other machinery, moved by water, for other purposes. But by chapter 116, § 1, Rev. St., the owner of any "water mill" is invested with those rights, and it may not be certain, that, with the greater demand and increase of machinery of all kinds, the words should not have a broader construction than the original subject-matter. I have been referred to no adjudged case other than grist or saw mills, except under a special law as to the Roxbury mill-dam, in 12 Pick. 467. There can be little doubt, however, that if the act extended to all flowing, and allowed it for the use of any machinery whatever, persons ought to be limited to flowing land alone, and not be permitted to flow so as to obstruct other machinery higher up. Hence the second section prohibits flowing on other machinery. And such would be the construction without that prohibition, or the law would prove suicidal. It would encourage and sustain one set of machinery, not so as to add more to the whole already in existence, but to overflow and drown out another set. The award in this case, therefore, avoids that consequence and absurdity, by requiring the dam to be lowered, so far as it floods the machinery of the United States. But it still allows it to flow back the water on the land of the United States, though reserved for a special public purpose. It treats this cession to the government as mere private property, not dedicated to any general use. By thus permitting the public cession to be flowed under the local statute, it subjects the property of the United States to local laws, and for local objects, contrary to the sound policy and safety of the general government, and the general objects for which the cession was procured.

A further objection, also, seems to apply to this case, so as to prevent any right in an individual to flow a public privilege, or public right of the United States, by virtue of a special statute in Massachusetts. That statute was intended to prevent multiplicity of actions between individuals, as well as to encourage the erection of mills, and justified so strong a measure as being very conducive to a public object, or one worthy of public aid and public favor. But it does not, in terms, allow this flowing, to the injury of, or encroachment on, other public privileges in the state, but merely on private lands. Nor is there any reason for allowing it to that extent, and thus aid one public object, to the danger or sacrifice of another. Hence in Com. v. Stevens, 10 Pick. 247, it was settled, that a mill-owner cannot be allowed to overflow a public highway; and the court say, "it seems manifest, that no encroachment on the public rights was

intended to be sanctioned." The principle here described applies more strongly to public rights of the United States than of the state, on account of their paramount importance, and the clearer power of the state to subject its own public rights to being overflowed, rather than those of the general government.[2] And though the award does not allow the flowing to continue, so as to stop the machinery of the armory, and defeat at once its great objects, yet it allows the flowing to encroach on public property, and the grounds of a great public establishment; to pass the line of the jurisdiction of the state, and doing this, it seems to me to be with difficulty vindicated.

The last objection is in respect to the validity of the award on two grounds, connected with the mode and power of making the submission. First. It is not an award by a rule of court, and thus becoming, in some respect, a record, whether taken out in a suit pending, or by a submission made in court under a statute, like that in England of 9 & 10 Wm. III. Nor is it an award, made under bonds of submission, with penal provisions to ensure its execution. But it is a mere parol agreement, made out of court, to refer the difficulty. And the opinion seems to be plausible, that no such agreement or award under it can be pleaded in bar to any action, unless previously accepted or carried into effect; and that until then, the remedy on such an award is by action, or bill in equity, or a rule to punish for contempt (Banert v. Echert [Case No. 837]), if not fulfilled when made under a rule of court. See Kyd, Awards, 318; 1 Bac. Abr. "Arbitration," H; 2 Ld. Raym. 1039. But without expressing a positive opinion on this, the next objection to the validity of the award is, in my view, decisive; and that is, the want of authority in any officer of the United States to enter into a submission in their behalf, which shall be binding. All judicial power is by the constitution vested in the supreme court, and such inferior courts as congress may, from time to time, ordain and establish. Const. U. S. art. 3, § 1. No department nor officer has a right to vest any of it elsewhere; and it has been questioned even if congress can vest it in any tribunals not organized by itself. [Martin v. Hunter] 1 Wheat. [14 U. S.] 304, 330, 336, and authorities cited in the case of The Sheazle [Case No. 12,734].

It is our duty to take notice that no act of congress has granted any authority to any arbitrators in cases like this; and hence, though the former district attorney speaks in the award as if authorized to submit this case, he doubtless means that he was "authorized" by the solicitor of the treasury

[2] See more on the power of the state to take away one public right under itself, for another paramount public object, cases 2 N. H. 22; 10 N. H. 369; 7 N. H. 35; 8 N. H. 398; 11 N. H. 19.

or war department to do so, and not by any special law. As we are bound to know that neither he nor they were authorized by any law for that purpose, it follows, that any arrangement by the solicitor of the treasury, or by the war department, or by the district attorney, to refer such a claim, is not binding. U. S. v. Nicoll [Case No. 15,879]. Such submissions and awards are sometimes useful, as they may be afterwards accepted and voluntarily enforced by the proper authority, as a guide to what is supposed to be nearly right and safe; but I can see no legal ground on which their execution can be compelled by a court of law. The case of the disputed title to the pea-patch in the Delaware Bay, is familiar to many of us, where a most inconvenient delay has occurred in authorizing a reference of the dispute by a special act of congress, it being conceded on all hands that no authority already existed for making such a reference. The demurrer to this plea must therefore prevail, and the case go to trial on the general issue. Demurrer allowed.