(113 N. W. 703.)

---

HENRY J. JOHNSON v. COUNTY OF GRAND FORKS, A MUNICIPAL
   CORPORATION, AND HANS ANDERSON, AS COUNTY AUDITOR OF
   THE COUNTY OF GRAND FORKS, NORTH DAKOTA.

Opinion filed Nev. 13, 1907.

**Primary Election — Qualification of Voters.**

   1. The primary election established by chapter 109, p. 207, Laws
   1905 (section 555, Rev. Codes 1905), is an election within the mean-
   ing of section 121 of the constitution, which prescribes the qualifica-
   tions for voters at "any election."

**Same — Ballots — Fee Required of Candidates.**

   2. It is incompetent for the legislature to require payment of a
   fee, either by voters or by candidates, as a condition to having the
   name of a candidate printed on the official primary election ballot
   provided for under such law, except such as may be a reasonable fee
   for services of auditor for filing petition.

**Same — Qualifications of Voters — Constitutional Law.**

3. It is incompetent for the legislature to prescribe qualifications of voters or candidates for office in addition to those fixed in the constitution.

**Same.**

4. The provision exacting fees for printing the names of candidates on the official primary election ballot required by section 4 (Laws 1905, p. 208, c. 109), of the law above referred to is unconstitutional, as being a qualification of voters and candidates not included in the constitutional requirements, and is an arbitrary, unwarranted, unreasonable, and unnecessary regulation of elections, having no tendency to promote honesty, fairness, or good order in the conduct of elections.

**Payment — Protest — Recovery.**

5. The plaintiff having paid the fee required by such law and demanded by the county auditor, before he was allowed to file his petition as a candidate, under protest, on the facts disclosed and admitted by the pleadings, an action at law to recover such fee is a proper remedy.

Appeal from District Court, Grand Forks county; *Templeton,* J.

Action by Henry J. Thompson against the county of Grand Forks and Hans Anderson, county auditor. Judgment for defendants. Plaintiff appeals.

Reversed.

*Bangs, Cooley & Hamilton,* for appellant.

Under section 129 of the constitution the legislature can regulate elections. Parvin v. Wimberg, 30 Am. St. 254; State v. Saxon, 32 Am. St. 46; Taylor v. Bleakley, 49 Am. St. 233; Talcot v. Philbrick, 20 Atl. 436; Atty. General v. City of Detroit, 44 N. W. 388; Cooley, Const. Lim. (6th Ed.) 758.

The constitutional right to vote can neither be enlarged or restricted. Spier v. Baker, 52 Pac. 659; 41 L. R. A. 196; People v. English, 29 N. E. 678; McCafferty v. Guyer, 59 Pa. St. 109; State v. Findlay, 19 Pac. 241; Levisley v. Litchfield, 83 Pac. 142; State v. Denoyer, 6 N. D. 586, 72 N. W. 1014.

Every elector has a constitutional right to become a candidate for office. State v. Drexel, 105 N. W. 174.

A primary election is an "election." Spier v. Baker, supra; State v. Baker, supra; People v. Board of Election Commissioners, 77 N. E. 321; State v. Scott, 108 N. W. 828; State v. Drexel, supra.

JOHNSON v. GRAND FORKS COUNTY ET AL. 365

*J. B. Wineman,* for respondent.

A law, otherwise invalid, will be sustained if the party objecting to it has, by prior acts, precluded himself from being heard in opposition. 8 Cyc. 791; Pierce v. Somerset Railway, 171 U. S. 641; State v. Moore, 92 N. W. 4; Ferguson v. Landram, 96 Am. Dec. 350; Montgomery v. Chelf, 82 S. W. 388.

Participation in the elective franchise is a privilege, not a right. Cooley on Con. Lim. (6th Ed.) 752.

SPALDING, J. This action was brought to recover fees paid by two candidates for nomination for treasurer and one for clerk of court of Grand Forks county at the primary election held on the 19th day of June, 1906. The complaint sets forth the necessary qualifications of the persons affected to entitle them to become candidates for the offices named, and that each presented a petition, complying with all the requirements of chapter 109, page 207, Laws N. D. 1905, known as the "primary election law," to the county auditor of that county, and demanded that their names be printed on one of the ballots to be used at such election as candidates for such offices. The complaint alleges that the county auditor demanded of each of them a fee equal to 2 per cent of the annual salary of the offices to which they respectively aspired, namely, from each of the candidates for treasurer $48, and from the candidate for clerk of court $40, and that he refused to print their names on such ballots unless paid such sums; that they paid the amounts demanded to procure their names to be so printed but that they paid the same under protest, and so notified the auditor. No claim is made that he demanded a greater sum than that required by law referred to. Two of the claims were, before this action was brought, assigned to the plaintiff, he being the third candidate. The defendants demurred to the complaint on the ground that it did not state a cause of action against them or either of them. This appeal is from the order sustaining such demurrer, and it raises the question of the constitutionality of those provisions of section 4 of the act in question (section 555, Rev. Codes 1905), requiring candidates for nomination for county and district offices at the primary election to pay certain fees to the county to entitle them to have their names printed on one of the ballots to be used at the primary election.

The fee required of candidates for nomination for county and district offices, except for some of the minor offices, is fixed by that section at 2 per cent of the annual salary of the office, except candidates for the state senate, who are required to pay the sum of $30, and representatives, the sum of $10, and candidates for sheriff, who pay the same as those for county auditor. The section referred to also provides that the money so received shall be covered into the general fund of the county. Prior to the enactment of this law, nominations had been made by the caucus and convention system. A caucus held in each precinct in which the voters of a party desired to participate in the nominations of candidates for the various offices at the ensuing election, and delegates were elected to a county or district convention, as the case might be. This county or district conventon composed of delegates elected by the various caucuses, made the nominations of candidates, whose names, on being certified to the county auditor by the officers of the convention, were printed as the party nominees to the various offices on the official ballot to be used at the general election. The same system prevailed for the nomination of representatives in congress, judges and state officials, except, as to them, the county convention elected delegates to the state or judicial convention which placed the candidates in nomination for the party. The methods pursued in such caucuses and conventions, it was believed, had become unrepresentative and unfair, if not corrupt, and the people demanded the enactment of a law under which direct nominations could be made, hoping thereby to eliminate many of the abuses which were thought to have become a part of the old system. Chapter 109, Laws 1905, was the result. This provides for the nomination of county and legislative candidates and the election of delegates to state conventions at a primary election to be held in June of each year at which a general election may occur. The objects of this chapter, though we think not of the provisions complained of in this action, were sought to be stated in the first section, which says: "It is the intention of this act to purify and reform the methods by which organized political parties shall make nominations of candidates for the several public offices, to perpetuate and strengthen political parties by eliminating therefrom the evils hereby sought to be corrected, and to secure each individual member and delegate of such party an absolute freedom and independence in the expression of his preferences relating to nomi-

nations by such parties and to prevent and prohibit the use and influence of methods, similar to that known as the unit rule, and this statute shall be so construed as to give force and effect to this expressed intention."

In trying to arrive at a decision of the questions at issue, it may be well to consider some of the principles underlying a republican form of government, and particularly those principles recognized by the people of this state in the organic law which they enacted, and which must serve as a guide, not only to them, but to their representatives and agents in the legislative, executive and judicial departments of the state. This law is the warrant under which they all act, and to the legislative department it is a limitation of authority. In determining its scope and meaning it often becomes necessary to consider what its terms imply, as well as what it says. Even if an act is not prohibited by the strict letter, it may still conflict with the objects sought to be attained, as gathered from the whole instrument in connection with a study of contemporaneous history. If so, it is equally as invalid as though the conflict was in express terms. In a republic the people are sovereign. They express this sovereignty through the ballot, by means of which they select their agents by whom it is exercised. The elective franchise is the most valuable right of the American citizen, and should be most sacredly treasured by them and as sacredly protected by the courts. The acts of the lawmakers are the acts of the people themselves, except as they may conflict with the limitations prescribed in the constitution, or necessarily implied from its language and purpose. The constitution prescribes the qualifications and requisites to entitle a resident or citizen of the state to use the franchise. Sections 121 and 127 define these qualifications in the following language: Section 121: "Every male person of the age of twenty-one years or upwards belonging to either of the following classes, who shall have resided in this state one year, and in the county six months, and in the precinct ninety days next preceding any election, shall be a qualified elector at such election: First. Citizens of the United States. Second. Civilized persons of Indian descent who shall have severed their tribal relations two years next preceding next election." Section 127: "No person who is under guardianship, non compos mentis, or insane, shall be qualified to vote at any election; nor any persons convicted of treason

or felony unless restored to civil rights; and the legislature shall by law establish an educational test as a qualification, and may prescribe penalties for failing, neglecting or refusing to vote at a general election." The provisions of the constitution are mandatory and prohibitive, unless by express words they are declared to be otherwise. Const., section 121. It is unquestioned that the legislature can neither enlarge nor diminish the qualifications necessary to entitle one to vote at a constitutional election. It cannot add to the term of residence required, either in the state, county or precinct; neither can it lessen either of these periods, nor by creating classes of voters deprive one qualified under the constitution from voting, or make one a voter not so made by such provision. The people in adopting the constitution containing these provisions recognized the necessity of stability and uniformity in such qualifications, and thereby protected all citizens from being subjected to the uncertainty which would arise if the standard of citizenship and qualifications for voting were left to the whims and caprice of the different legislative assemblies, governed, as they might be, by varying purposes and ideals. The legislature cannot prescribe a property qualification as a prerequisite to being allowed to vote. It cannot require a voter to pay a sum of money to any officer or to any department of government before he can vote. The standard by which his rights must be measured are fixed by the constitution. Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196; People v. English, 139 Ill. 622, 29 N. E. 678, 15 L. R. A. 131; McCafferty v. Guyer, 59 Pa. 109; State v. Findlay, 20 Nev. 198, 19 Pac. 241, 19 Am. St. Rep. 346; Livesley v. Litchfield, 47 Or. 248, 83 Pac. 142, 114 Am. St. Rep. 920; Cooley Const. Lim. (6th Ed.) p. 753. In Spier v. Baker, supra, the Supreme Court of California, in considering the primary election law of that state adopted in 1897, said: "The legislature has no power to deprive any citizen of the state who fills all the requirements demanded by the section of the constitution quoted from voting at an election provided for by this act. In this country the right to vote is recognized as one of the highest privileges of the citizen. It is so recognized, not only by the citizen, but by the law; and any infringement by legislative power upon that right as granted by the constitution is idle legislation. If the legislature has by this act deprived citizens of the right to participate in the elections therein provided who are qualified to participate under the constitution

—aye, even if the legislature has deprived one citizen so qualified of such right—the act is void, as an attempted exercise of power it does not possess." This must not, however, be construed to mean that the legislature has no right to prescribe reasonable rules and regulations by which the conduct of elections shall be governed in the interest of good order, fairness and honesty. The legislature has the right to make any reasonable regulations to prevent fraud in the conduct of elections, voting by persons not qualified under the constitution, and for the speedy conduct of the business incident to elections. The question for courts to determine is whether they go beyond the bounds of reason, and whether they place any restrictions around the exercise of the right of suffrage which limits it arbitrarily or unnecessarily.

It is contended that the primary election authorized by the law under consideration is not such an election as was contemplated by the framers of the constitution. In other words, that it is not a constitutional election, and that, therefore, it is not governed by the constitutional limitations. We cannot agree with this contention. Section 121 of the constitution prescribes the qualifications for voters at "any election." It is true that at the time of the adoption of the constitution a primary election law was unknown in this state, but constitution makers are not presumed to foresee and take into consideration every new condition which may arise or every new remedy which may be devised for application to old conditions. Constitutions do not deal in details. They comprise general principles and general directions which are intended to apply to all new facts and conditions which may come into being, and which may be brought within the terms of these general principles or directions, and, when the constitution says "any election," in prescribing the qualifications of voters, it does not mean simply any election then known to the people of the state. It means, not only any election then provided for by the laws and constitution, but any election which may thereafter be established or required to be held pursuant to law. This principle has been recognized by numerous courts. The constitution of the state of California provides the qualifications necessary to entitle a person to vote at elections "authorized by law," and in Spier v. Baker, supra, the court holds that primary elections thereafter provided for are elections "authorized by law," and says that any infringement by the legislative power upon the right to vote as granted by

the constitution is idle legislation, and that any attempt of this kind is an exercise of power it does not possess. In the same case the court says: "It must be an election under this provision of the constitution, or the legislature would have no power to provide that money should be taken from the state and county treasuries to pay the expenses of conducting it. The validity of any taxation looking towards the raising of money for such purposes would be absolutely void if the elections provided for by the act are not elections recognized by and referred to in this constitutional provision. These things being true, the legislature has no power to deprive any citizen of the state who fills all the requirements demanded by the section of the constitution quoted from voting at an election provided for by this act." In People v. Board of Election Commissioners of Chicago, 221 Ill. 9, 77 N. E. 321, the Supreme Court of Illinois held that, although at the time the constitution was adopted primary elections as such were not within the contemplation of the convention or the people and had not been made a part of the election system, yet that the primary election subsequently provided for by the law was an election within the meaning of that word as used in the constitution. To same effect, see Leonard v. Commonwealth, 112 Pa. 607, 4 Atl. 220.

Two methods are recognized by which persons may become candidates for office. In popular parlance they are distinguished as the "man seeking the office," and the "office seeking the man." Under this provision of the primary election law, it may be presumed that the man seeking the office will first provide the necessary means with which to pay the fee required. But what if the office seeks the man, and the man whom the people demand is inactive or indifferent and either unable or unwilling to pay the fee? It necessarily follows, if the voters are entitled to exercise their privilege of placing a man in nomination who declines to be an active candidate or to pay the fee, that they themselves must contribute the amount necessary to secure his recognition as a candidate for nomination under this law, and it seems clear that such a necessity imposes upon the voters a burden not contemplated or permitted by the constitution. It may be answered that it is unnecessary that the name of a candidate be printed on the ballot, that provision is made and a space left in which the name can be written, and that by means of this provision, each voter is left free to express his choice. Abstractly considered, this is true,

but in the practical operation of the system it is false. We all know that the candidate whose name is printed on the official ballot is the only one who, under any ordinary circumstances, can be successful in a state whose boundaries are as extended as those of this state, and whose population is as sparse. Necessarily the people of one part of the state are strangers to those of another part; the issue which may be thought paramount in one part of the state may be unfamiliar to the voters in a remote part, and to secure the co-operation necessary to make the candidacy of any person whose name is not printed on the ballot used in all parts of the state successful, or even to secure his recognition in a small way, is utterly impracticable. So, to all ordinary intents, and in all except extraordinary emergencies, this provision is valueless.

Of course, we have discussed this not solely with reference to the county or district, but with reference to the general principles involved, as it is general principles that must govern. While this law only applies to counties and districts, similar provisions and requirements have now been made applicable to the nomination of state officials. The same principles which apply to the qualifications of a voter are also applicable to those of a candidate. In a general way, the qualifications required of candidates for office are the same as those for voters. The constitution makes some exceptions by prescribing that some officials shall be of greater age than 21 years, or that they shall have resided in the state a longer period than is necessary to qualify them to vote, or that they shall be members of a certain profession, but these are qualifications deemed essential to fit a person for a particular office, and do not affect the general principle; namely, that the legislature can neither increase or diminish the qualifications fixed by the constitution for holding office. The rule is that, when the constitution of a state has prescribed qualifications for voters and defined the qualifications of an officer, it is not competent for the legislature to add to or in any way alter such prescribed and defined qualifications, unless the power to do so is expressly or by necessary implication conferred upon it by the constitution itself. McCrary on Elections (2d Ed.) sections 72-226-252; U. S. v. Slater (C. C.) 6 Fed. 824, 4 Woods, 356; Rison v. Farr, 24 Ark. 161, 87 Am. Dec. 52; Quinn v. State, 35 Ind. 485, 9 Am. Rep. 754; Blair v. Ridgely, 41 Mo. 63, 97 Am. Dec. 248, and cases cited in note 1; Spier v. Baker, supra; People v. Board,

supra; State v. Stafford, 120 Wis. 203, 97 N. W. 921, 1043; State v. Drexel (Neb.) 105 N. W. 174; State v. Holman et al., 58 Minn. 219, 59 N. W. 1006; Thomas v. Owens, 4 Md. 189; Dapper v. Smith, 138 Mich. 104, 101 N. W. 60.

It cannot be contended that the payment of this fee has any tendency to prevent fraud or that it is conducive to orderly elections, but it is argued that the requirement is not unreasonable. The constitution requires no fee. If we once admit the power of the legislature to make even the smallest additions not contemplated by the constitution to the qualifications required to entitle one to vote, there is no limit to the requirements which may be added. What then, was the object of this requirement? We can discover none unless it was to prevent a multiplicity of candidates. But this object is something beyond the purview of legitimate legislation. It might be asked if we were to consider the policy of the legislation, whether it would not be the part of wisdom to encourage an increase in the number of candidates for the different offices, rather than to restrain the people from becoming candidates? The greater number of candidates the greater variety of choice presented to the individual voter, and the more probable becomes the selection of those best fitted for representative positions. This election is intended as a party election. It takes the place of party conventions, and no provision is made for any except those candidates representing parties. The plain spirit of our system is to make it easy for voters to make their choice; and to this end that every aggregation of voters representing a party or principle shall have the opportunity for representation on the official ballot. We are of the opinion that the legislature has no power to pass any law having for its purpose the restriction or limitation of the number of candidates who have otherwise qualified to hold office. If the fee as fixed is to stand, the practical working of the law is to discourage and possibly eliminate all party effort, except on the part of the majority party. In a county, district or state in which from 65 per cent to 80 per cent of the voters affiliate with one party few candidates of minority parties can be expected to make the payment required. The legislature might with greater propriety and fairness have limited it to the dominant party. It is a practical prohibition on all voters of the minority party participating in the primaries as members of such parties. "Active political parties, parties in opposition to the dominant po-

litical party, are, as has been said, essential to the very existence of our government. The right of any party of men holding common political beliefs, or governmental principles, to advocate their views through party organization, cannot be denied. * * * The law which will destroy such party organization or permit it fraudulently to pass into the hands of its enemies cannot be upheld. The procedure of political parties may be regulated, and the wisdom of the legislature may well be exercised in devising methods to check political corruption and fraud, but the legislature itself under the guise of regulation cannot be permitted to throw open the doors to these very abuses." Britton v. Board of Commissioners, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115; Mr. Wigmore, at page 54 of his work on the Australian Ballot System, says: "But it is to be remembered that in this country a candidacy may be hopeless as regards the election of the nominee, and yet important and highly desirable as a means of exhibiting the strength of a section of electors or of a particular movement, and, of course, compelling the attention of the leading parties, and the modification of their platforms and legislative policies. "It will be seen, therefore, that the plan of requiring a reasonable deposit is not adapted to our political methods, and that its adoption would be ill advised." We are of the opinion that the constitutional provisions are not only applicable to primary elections provided for and required to be held as elections, but that they are applicable to them as steps looking toward the election of officials. It would be the greatest folly to prescribe qualifications for voters and candidates at the general election, and then let down the bars or make greater restrictions applicable to voters in the selection of candidates to be voted for at such election. The caucus and the primary are at a foundation of the elective system. If anybody can vote regardless of constitutional restrictions at the primary, or if the legislature can increase the qualifications of voters or candidates at a primary, the constitutional restrictions applicable to voters and candidates at the general election have no meaning. We read in the words of the constitution what are the tests of a legal voter at a general election; but of what avail is the express language of that instrument on that subject if the legislature may nevertheless fix other and different tests before one can take the first steps necessary to enable him to take part in that election? The plain implication is that nowhere on

the way to the general election can additional tests be required. It is said in People v. Board of Election Commissioners of Chicago, that "every eligible person has a right to be a candidate for office without being subject to unreasonable burdens. The voters have a right to choose any eligible person, and he owes a duty to the public to qualify and serve;" and again: "There can be no discrimination between candidates based on the ground that one has money and chooses to pay for the privilege of being a candidate, and the other has no money or is unwilling to pay for being a candidate." See, also, People v. Williams, 145 Ill. 573, 33 N. E. 849, 24 L. R. A. 492, 36 Am. St. Rep. 514. If the legislature can require the candidate to buy his way to office, it simply lends the legislative sanction to an additional means of corruption quite as vicious in principle as any which the primary law was intended to correct. Section 127 of the constitution permits the legislature to prescribe penalties for failing, refusing or neglecting to vote. If the law under consideration is valid, it becomes possible for the legislature to penalize both for failing to vote and for voting.

The Supreme Courts of Illinois and Nebraska, in addition to the quotations already made, have given additional reasons for their invalidity, which we must notice and approve as applicable to the law in question. In 1901 the legislature of Illinois enacted a primary election law by which any one desiring to become a candidate for governor, United States senator, or congress was required to pay a fee of $100, and each candidate for state senator $50, and for member of the house of representatives, $25; and in considering the constitutionality of that requirement, that court said: "These payments bear no relation to the services rendered in filing the papers or the expenses of the election. They are purely arbitrary exactions of money to be paid into the public treasury as a monetary consideration for being permitted to be a candidate. The payments are not intended to be a compensation for filing papers;" and held requirements as to fees unconstitutional. People v. Board, supra. The legislature of Nebraska in 1905 also provided a primary election law, and in relation to the payment of fees required of candidates (1 per cent of the emoluments of the term) that court said: "It is to be observed that the amount thus required to be paid before one can have his name submitted to the. voters at the primary is fixed arbitrarily, and wholly re-

gardless of the services performed in filing nomination papers.  A person aspiring to be nominated for clerk of the district court would be required to pay perhaps $200, a candidate for the nomination of county clerk probably $40; other candidates for county office different sums, ranging between the two extremes.  Is it competent for the legislature to impose burdens of this character on those desiring to become candidates for public offices, the nominations for which come within the provisions of the primary election law?  Can a test of ability to pay fees of the magnitude mentioned be made as to one's right to be voted for at a primary election?  It is at first glance apparent that these enormous fees prevent many from becoming candidates for party recognition who otherwise would be willing to yield to a public demand that they become candidates for public office.  It is said the fees required to be paid in the manner stated are for the purpose of defraying the expenses of the primary.  It is not so stated in the act.  It is expressly provided the expenses of the primary are to be paid out of the public treasury.  It is not, therefore, required of us to pass upon the question of the power of the legislature to require those submitting their names to be voted for at a primary to pay the expenses of the election.  It appears from the act itself that there is no relation between the charges made for filing nomination papers as therein provided and the expenses incident to a primary election, nor to the value of the services in filing the nomination papers.  The charges are arbitrary and unreasonable.  They make the pecuniary ability of the person to pay the same a test as to his qualification to become a candidate for party nomination.  The law is as objectionable as if the test was based on a property qualification or the amount the elector had contributed to the public revenues.  The primary election contemplated in the act may not in and of itself be an election within the meaning of the constitutional provisions, which guarantee that "all elections shall be free," and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise.  Section 22, article 1, Const: It is, however, a means to an end.  It is a part of the election machinery by which it is determined who shall be permitted to have their names appear on the official ballot as candidates for public office."  "To say that the voters are free to exercise the elective franchise at a general election for nominees in the choice of which unwarranted restrictions and hindrances were in-

terposed would be hollow mockery. The right to freely choose candidates for public office is as valuable as the right to vote for them after they are chosen." State v. Drexel, supra. The Supreme Court of Minnesota in State v. Scott, 99 Minn. 145, 108 N. W. 828, in passing on the provisions of the primary election law of that state, which require the payment of a fee of $20 when the petition of the candidate is required to be filed with the secretary of state, and $10 when filed with the county auditor, referring to the Nebraska and Illinois cases cited, apparently approves of those decisions as applied to the fees required by the laws of those states, for it says. "We need not deny that both acts were arbitrary and unreasonable in the exaction of fees;" but held that the fee of $20 or $10 required by the Minnesota law was not an unreasonable regulation.

It is insisted that the reasons for the Illinois and Nebraska decisions do not apply in this state, because our law requires a space on the official ballot for writing additional names of candidates which was not provided for in one of those states, and for the further reason that our constitution carries no requirement that all elections shall be free and equal. We are, however, satisfied that neither of such distinctions affects the principles involved, and think they need no answer in addition to what we have hereinbefore given. We may add that courts hold that the expression "free and equal" has no reference to payment of fees. For these reasons we think the provisions of the law in question attacked in this action are invalid, and so hold.

The respondents argue that the appellant should have applied to the court for a writ of mandamus to compel the auditor to cause his name to be printed upon the ballot without the payment of a fee, and that, by failing to do so, he waived his right to question the constitutionality of the act. A discussion of this proposition is unnecessary, because the plaintiff alleged in his complaint that there was insufficient time before said primary election for the candidates named in the complaint to institute an action or any special proceedings, either at law or otherwise, for the purpose of compelling the county auditor to place their names upon the ballot, and that they were compelled by reason of this fact to make the payments demanded. The defendants by demurrer to the complaint admitted this allegation and the case comes to this court on the pleadings, and we are precluded from inquiring into the facts

further than is admitted by the demurrer of the defendants. We must take such admissions as true. We must, therefore, hold that the procedure adopted in this case was proper. Lest this opinion be misconstrued, we add that it applies to no part of the act referred to, except that requiring the payment of a fee.

The district court erred in sustaining the defendant's demurrer, and its order doing so is reversed. All concur.