[No. 2136]

## STATE OF NEVADA, EX REL. ARTIE B. RIGGLE, RELATOR, v. GEORGE BRODIGAN, AS SECRETARY OF STATE OF THE STATE OF NEVADA, RESPONDENT.

[143 Pac. 238]

1. CONSTITUTIONAL LAW—PRESUMPTION AS TO VALIDITY OF STATUTES.
   All acts of the legislature are presumed to be valid until it is clearly shown that they are unconstitutional.

2. ELECTIONS—FILING FEE—VALIDITY.
   Stats. 1913, c. 284, subc. 3, sec. 9, imposing upon candidates for state offices a fee of $100 as a condition to filing nomination papers so that their names will go on the ballot, is valid, being a regulation, and not an additional qualification, and it being within the scope of the legislature's power to impose a substantial fee to prevent persons from placing their names on the ballots for fraudulent purposes, such as to draw strength in small localities from one candidate to benefit another.

NORCROSS, J., dissenting.

ORIGINAL PROCEEDING. Application by the State of Nevada, on relation of Artie B. Riggle, for a writ of *mandamus* against George Brodigan, Secretary of State. **Writ denied.**

*A. Grant Miller* and *James M. Frame*, for Relator.

*Geo. B. Thatcher*, Attorney-General, for Respondent.

By the Court, TALBOT, C. J.:

The relator applies to this court for a writ of mandate to compel the respondent, the secretary of state, to file a verified nomination paper of relator as a candidate for the office of secretary of state. Respondent refused to file this paper, because the relator declined and failed to pay the fee of $100 provided by the statute as a condition for such filing. (Stats. 1913, p. 514.) It is shown, and not denied, that the relator is a citizen of the United States and a fully qualified elector of the State of Nevada, and that he possesses all the constitutional qualifications for the office for which he seeks the Socialist party nomination. He alleges that he is working for wages, and has not the sum of $100 with which to pay the filing fee, and

that he has no means or resources that would enable him to raise the amount required.

On behalf of the relator it is contended that the provision of the primary election law imposing a filing fee is unconstitutional, because it adds a money qualification as a condition precedent to becoming a candidate for public office; that the legislature was without power to impose more than a nominal filing fee; and that, even if the legislature had power to impose more than a nominal fee, the one prescribed is so unreasonable as to render the provision imposing it void.

In the courts which have considered this question two different views have been held. A part of these courts have taken the view that the legislature is without power to impose a fee for filing nomination papers greater than may be a reasonable fee for the service of the officer filing the petition. (*State* v. *Drexel*, 105 N. W. 174, 74 Neb. 776; *Ballinger* v. *McLaughlin*, 22 S. D. 206, 116 N. W. 70; *Johnson* v. *Grand Forks*, 16 N. D. 363, 113 N. W. 1071, 125 Am. St. Rep. 662; *People* v. *Election Commissioners*, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562.) Cases holding that more than a nominal fee may be required are: *Socialist Party* v. *Uhl*, 155 Cal. 776, 103 Pac. 181; *State* v. *Nichols*, 50 Wash. 508, 97 Pac. 728; *State* v. *Scott*, 99 Minn. 145, 108 N. W. 828; *Kenneweg* v. *Commissioners*, 102 Md. 119, 62 Atl. 249.

This tribunal is already aligned with the courts which have sustained legislative acts requiring more than nominal fees from candidates for nomination for public office. In *Riter* v. *Douglass*, 32 Nev. 437, 109 Pac. 444, we held that the statute of 1909 requiring the payment of a fee of $50 by a candidate for the party nomination for a state office, and the obtaining and filing by him of a petition signed by a percentage of the voters, was not unreasonable. There was complaint and difficulty regarding the obtaining of these petitions by candidates, and after the rendition of that decision the legislature changed the law to provide for a fee of $100, and omitted the

requirement for the petition. If the trouble and expense of obtaining a petition signed by 3 per cent of the voters of the state be considered an exaction of as much or more from the candidate as the payment of $50, which was added to the original $50 fee in lieu of the petition signed by a percentage of the voters, there is no good reason why the $100 fee may not be required, if the decision in the Riter-Douglass case was correct.

Under the original primary law as sustained by that decision, each signer of a nomination paper was required to verify the same before some officer authorized to administer oaths, or before a special verification deputy, and the regular fees for notaries public for these verifications by 3 per cent of the voters of some of the political parties would exceed the $50 added to the fee by the law under the amendment as it now stands. Consequently the former decision of this court sustained the act of the legislature under which, if as much was paid for these verifications as the statutory notarial fees therefor, the nomination of a candidate of the larger political parties, with the former $50 filing fee, would have amounted to more than the $100 now exacted, besides the trouble of obtaining the petition, which is no longer required.

The cases in other states in which the question has been determined are about equally divided, and should this court reverse it unanimous decision in the Riter-Douglass case, holding such a law to be constitutional? After we have said that the requirement of such fee, petitions, and signatures were not unreasonable or unconstitutional, and the legislature amended the law so as to require an additional $50 to be paid in the fee, but relieved the candidate from the necessity of obtaining the petition, signatures, and verifications, it appears that the decision in the Riter-Douglass case fully justified the legislature in amending the law, and that for this court to now hold that the law as amended is unconstitutional would be equivalent to leading the legislature into amending the law and then determining that such law is unconstitutional.

[1–2] The decisions are numerous holding that all acts

of the legislature are presumed to be valid until it is clearly shown that they are unconstitutional. If the exaction of a fee of $50, as previously held by this court, did not render the law invalid, we are unable to see how the requirement of $50 additional fee would make the law unconstitutional. If personally we believe that the fee of $50 was high enough, and that at the most it should not exceed $100, we do not wish to set aside the judgment of the two houses of the legislature and the governor in passing and approving the law fixing the fee at $100 and eliminating the requirement for the petition and verifications, and thereby, in effect, reverse the principle sustained by our decision in the Riter-Douglass case, and order the respondent to file a nomination paper without the payment of any fee.

Although a candidate for a state office may be without funds with which to pay a fee of $100, or $10, or even a nominal fee, in view of the importance of state offices and the proper qualifications for filling them, and the liberal salaries paid, which are usually from a few to several thousands of dollars a year, we do not think that under the conditions now and heretofore prevailing a fee of $100 can be considered so unreasonable or arbitrary as to make the law invalid or as imposed for purposes other than regulation. Political conventions have sometimes exacted as large a fee from a candidate seeking a nomination before the convention, and some of the political parties have made it a rule in this state for more than a generation to levy assessments on candidates many times in excess of the fee exacted by the statute.

The Supreme Court of California sustained the requirement for the payment of a fee of $50, and the Supreme Court of Washington for a fee equivalent to 1 per cent of one year's salary, on which basis a filing fee for some offices in this state would amount to $60 or $70. The fee should not be so high as to prevent any elector from running for office who is competent and worthy, and who has a fair chance of being elected, or for whom any considerable proportion of the voters might desire to cast their ballots. Certainly a fee of $100 is fully as much as

should be required from a candidate for any office; but in view of the opinion in the Riter-Douglass case, which gave no intimation to the legislature that a fee of more than $50, in addition to the petition, might not be required, and of the decisions of other courts which have held that more than a nominal fee may be required, and considering the amount usually paid by candidates for campaign expenses and as party assessments in this state, and the liberal salaries paid to public officers, we are not prepared to say that the $100 designated in the statute is so excessive that it may not be collected. To hold otherwise might allow candidates for state offices to file their own nomination papers, and have others file in their interest, without paying any fee.

It is within the province of the legislature to consider whether, if only a nominal fee were required, the ballot might, in certain instances, be incumbered by the names of many candidates without chance of election, who, without expectation that they would be elected, might, in the interest of another candidate, run in certain localities where the opposing candidate is popular for the purpose of dividing his vote, and to exact a reasonable fee for the purpose of preventing, at least in some degree, such a result. The statute does not require any fee to be paid by a candidate for regent of the state university, an important office which carries no salary.

Under our former decision the people's representatives in the lawmaking body assembled have the right to make any reasonable regulations regarding elections and to fix any fee which is not unreasonable. It necessarily follows that they have considerable discretion, and the court should not be overstrict in order to set aside the statute which they have deliberately enacted. It may happen that a worthy candidate for an important state office does not possess $100, or any considerable part of that amount, but it may be assumed that, if there is much demand that he run for office, his friends or the people desiring that he become a candidate will arrange for the payment of the

fee. In *State* v. *Nichols,* 50 Wash. 508; 97 Pac. 728, the "right to exact a reasonable fee for the privilege of running for office" was sustained, and the statute which exacted 1 per cent of the salary was upheld. The court said:

"The state but asks the candidates for office under a particular law to reimburse it for a part of the expenses it incurs in carrying that law into effect. This clearly the state may lawfully do."

The candidates concerned in this case are seeking to appear as party candidates on the ticket for the general election. As the constitution does not state that any rights are guaranteed to any political party, it may be questioned whether the legislature may not entirely prohibit candidates for office from appearing under any party designation on the ticket at the general election, the same as is required in some states for candidates for judicial offices, and consequently exact fees so large as to be partly or wholly prohibitive. If it be conceded that the courts should be kept out of politics, and candidates for judicial positions not allowed under party designations, may not the state, acting through its legislature, prohibit any candidate from running as a Democrat, Republican, Progressive, or Socialist, or under any party designation, even if it be granted that any citizen has the constitutional right to run for any office as an independent or simply as a candidate without the payment of any fee? In what way can it be said that the constitution requires the legislature to enact laws in the interest of any party, or to allow any elector to run for public office under any party designation?

The application for the writ is denied.

McCARRAN, J., concurring:

I concur in the opinion written by Chief Justice TALBOT. The fee required by the act of 1913 is imposed by way of regulation, and not as an additional qualification. (*Socialist Party* v. *Uhl,* 155 Cal. 776, 103 Pac. 181.)

Under the former law, unanimously sustained by this court in the case of *Riter* v. *Douglass, supra,* a fee of $50 was required, and, in addition, a petition signed by 3 per cent of the voters of the state. These conditions were undoubtedly imposed by way of regulation and in order to prevent promiscuous filing of nomination papers. The legislature having before it the experience of its members as well as the experience of state and county officials elected under the former law unquestionably yielded to a popular demand for a change in the regulations, and with that in view the subsequent act was passed, which act did away with the requirement of petitions signed by any percentage of the voters, and in place of such petition a filing fee of $100 was imposed. By this act the legislature did away with the burdensome expense imposed on candidates in circulating petitions, as well as the annoyance attendant thereon.

The legislature is the lawmaking body. It speaks for the policy of the people of the state, and its functions should not be assumed by the courts. That branch of the government having as its office the making of the law must be accredited with having a conception of what is reasonable and what is an unreasonable regulation, and, unless unreasonableness is apparent and manifest, the court should not discredit its judgment or assume its functions, nor should it set itself up as being possessed of more immaculate judgment as to the reasonableness or unreasonableness of the regulation than the people whose representatives create legislative acts.

NORCROSS, J., dissenting:

I am unable to concur in the views expressed by my learned associates for the following reasons: The relator has the constitutional qualifications for the office for which he seeks a party nomination; the majority of the courts that have considered the question hold that the legislature is without power to impose upon candidates for a party primary nomination more than a nominal filing fee covering the expense of the services of the

filing officer; those courts which hold that more than a nominal fee may be imposed, as a matter of regulation, limit such fee to a reasonable one, such as is not so large as to impose a hardship upon any person for whom there may be any considerable desire to vote at a nominating election, and yet enough to prevent a wholesale filing of petitions by persons regardless of whether or not they are desirable candidates; that a filing fee as high as $100 has never by any court been sustained as reasonable, but, upon the contrary, a fee in so large an amount has been both expressly and impliedly held to be unreasonable; that the change made by the statute of 1913, imposing the same fee for filing independent petitions as for filing primary nomination papers and forbidding the use in such petitions of the name of a prior existing party, cuts off the right which formerly existed to so secure a place upon the ballot with the use of a party designation, thus limiting the right to the use of a party designation in any form to nominations obtained through primary elections; that to so cut off the right to obtain a place upon the official ballot with the use of a party designation by petition of electors renders any fee imposed for filing primary nomination papers subject to a more rigid test as to reasonableness than might otherwise be the case.

In *Riter* v. *Douglass*, 32 Nev. 400, 109 Pac. 444, we sustained the view that the legislature could impose a reasonable filing fee for primary nomination papers. The question presented in that case was not as to whether the fee of $50, imposed by the statute of 1909, was reasonable or unreasonable, but as to the power of the legislature to impose any fee at all. The same situation was presented in the California and Washington cases, cited in support of the rule that the legislature could impose reasonable filing fees in excess of a mere nominal fee.

The question of the reasonableness of a filing fee was directly presented in the case of *State* v. *Scott*, 99 Minn. 145, 108 N. W. 828, which may be regarded as the leading case supporting the rule that a reasonable fee may be imposed. This was a proceeding in *mandamus* to compel

the filing, without payment of the fee prescribed therefor, of relator's affidavit of candidacy for nomination as a member of the Prohibition party for the legislature. The Minnesota statute prescribed a filing fee of $20 in the case of state candidates and $10 in other cases. The court, among other things, said:

"The amount should be fixed at a point which would not impose a hardship upon any person for whom there may be any considerable desire to vote at a nominating election, and yet enough to prevent a wholesale filing of petitions, for nominations by any one, regardless of whether or not they are desirable candidates. * * * When all these considerations are taken into account, we are of the opinion that the sum of $10 is not so large but that any person who may be called upon to stand as a candidate for public office can obtain the amount without hardship. * * * The law very wisely assumes that any candidate who is proper material to stand as such before the people for any public office requiring a fee of $10 or $20 will find no difficulty in raising the amount."

Referring to the provisions of the Illinois and Nebraska statutes, held to be unconstitutional in the cases of *People* v. *Election Commissioners*, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562, and in *State* v. *Drexel*, 74 Neb. 776, 105 N.W. 174, the Minnesota court further said: "We need not deny that both acts were arbitrary and unreasonable in the exaction of fees."

The highest fee prescribed under the Illinois statute was $100, the same as is involved here. The statute was assailed as unconstitutional by representatives of the Socialist party. The Illinois court, in the Election Commissioners' case, *supra*, said:

"These payments bear no relation to the services rendered in filing the papers or the expenses of the election. They are purely arbitrary exactions of money, to be paid into the· public treasuries as a monetary consideration for being permitted to be a candidate. The payments are not intended as compensation for services rendered in filing the papers, but the provisions make

the ability and inclination of a person to pay money a test of his qualification and of the right of the voters to choose him for public office. Every eligible person has a right to be a candidate for a public office without being subject to arbitrary or unreasonable burdens. The voters have a right to choose any eligible person, and he owes a duty to the public to qualify and serve."

The North Dakota court, in *Johnson* v. *Grand Forks County*, 16 N. D. 363, 113 N.W. 1071, 125 Am. St. Rep. 662, in holding void a statute imposing a fee of 2 per cent of the annual salary of the office for which primary nomination was sought, said: "If the fee as fixed is to stand, the practical working of the law is to discourage and possibly eliminate all party effort, except on the part of the majority party."

In *Ballinger* v. *McLaughlin*, 22 S. D. 206, 116 N. W. 70, the South Dakota court, considering a similar question, said: "If, in connection with the filing of nominating petitions, the legislature has power to impose, as a condition precedent, the payment of any sum in excess of a uniform nominal filing fee, it is difficult to understand how the courts could formulate a rule of general application by which they shall be guided in determining when the required amount is excessive and when it is not."

Considering a statute imposing a fee of 1 per cent of the emoluments of the office, the Nebraska court, in *State* v. *Drexel, supra*, said: "Can a test of ability to pay fees of the magnitude mentioned be made as to one's right to be voted for at a primary election? It is, at first glance, apparent that these enormous fees prevent many from becoming candidates for party recognition who otherwise would be willing to yield to a public demand that they become candidates for nomination for a public office. * * * The charges are arbitrary and unreasonable. They make the pecuniary ability of a person to pay the same a test as to his qualification to become a candidate for a party nomination. * * * The right to freely choose candidates for public offices is as valuable as the right to vote for them after they are chosen."

See, also, *Ledgerwood* v. *Pitts*, 122 Tenn. 570, 125 S. W. 1036.

In *Riter* v. *Douglass, supra,* this court held that, under the primary election law of 1909: "If candidates or political parties do not wish to avail themselves of the privilege accorded them of securing their nominations as now provided by the primary law, or by reason of not being able to qualify with the legislative requirements imposed, they still have the constitutional privilege of running independently."

It is now provided by section 3 of chapter 5 of the statute of 1913 that candidates seeking a place on the general election ballot by petition of electors cannot use the name of a "political party existing at the last preceding general election," and section 7 of the same chapter imposes the same fees as for a primary nomination. In these two respects a radical change was made from the prior existing law.

Even if it were conceded to be manifest that the legislature has no power to impose such fees on candidates by petition of electors, nevertheless relator is now debarred from using his party designation as he formerly could by having his name appear upon the official ballot as "Electors Socialist," "Independent Socialist," or some similar designation. It thus appears that relator cannot have his name upon either ballot with the use of his party designation except by the payment of the fee prescribed for filing his primary nomination paper.

The courts which have adopted the rule that a reasonable fee, in excess of a mere nominal fee covering the expense of the mere filing of papers, have, necessarily, imposed upon themselves the burden, of doubtful propriety, of supervising the discretion of the legislature. When the courts hold that the legislature has power to impose a reasonable fee, they necessarily say that the legislature may not impose an unreasonable or capricious fee.. Suppose, for example, the legislature should impose a fee of $500 or $1,000 for filing a nomination paper. A court would have no difficulty in declaring

such fees so exorbitant as virtually to deprive the great body of electors of becoming aspirants for public office. The difficulty in enforcing the rule of reasonable fees is in drawing the line between what is reasonable and what is unreasonable. The right of an elector to become a candidate for a public office being guaranteed by the constitution, such right cannot be destroyed under guise of regulation. Government cannot exist without office-holders who voluntarily seek public office; hence the public at large is more interested than is the individual in requiring that unreasonable conditions be not imposed on citizens who may become candidates.

From the admitted facts in this case a number of electors who are desirous of becoming candidates for party nomination for several state offices may not become such party candidates if such a fee may lawfully be exacted, and in the case of the relator it is an admitted fact that he cannot pay the required filing fee because of pecuniary inability to do so. It is asserted by counsel for petitioner, and not controverted, that these several candidates have been, by some form of referendum, already approved as the desired candidates of a political party which in the last election, we judicially know, polled more than 15 per cent of the entire vote of the state, and that, if their nomination papers cannot be filed, such party will be without candidates for such offices. A fee that is so large as to tend to prevent minority parties from having representation upon the official ballot can scarcely be said to be reasonable. Constitutions are largely designed to protect the individual or the minority against the unlawful encroachments of majorities. Minority parties have rights and play a part in the scheme of government scarcely less important than that of majority parties. Parties are the practical means through which the great body of electors express their voice in the policies that should control in the matter of government and the means by which existing policies may be changed when a majority of electors so decree. The majority party of today may be the minority party of tomorrow, and *vice*

*versa.* This is illustrated in our own state when in the election of 1892 the two present leading parties in the state cast a combined vote only about equal to the vote of relator's party in the last election. It is no answer to say that the constitution itself does not recognize party organizations. Electors have the constitutional right to organize into political parties, and the legislature has recognized the fact of parties by providing a method by which party electors may be nominated for public office. It is a "condition, and not a theory," that the great majority of electors seek public office through party nominations. Unreasonable conditions cannot be sanctioned in the matter of an elector exercising his constitutional right to seek public office as the representative of a political party. A fee of $100 is a considerable burden upon the ordinary citizen. It is equal to the amount of ordinary taxes for state and county purposes on a property value of $3,000 or $4,000. It is, in effect, a heavy tax upon the individual willing to serve the state in public office.

Conceding that in the Riter case we held that a $50 fee was reasonable, it does not follow that when the legislature doubled the amount of that fee it did not exceed the bounds of reasonableness, especially so when it deprived an elector of the right, by petition of electors, of securing a place on the official ballot with the use of a prior existing party designation in any form. The decision in the Riter case should not, in my judgment, be considered conclusive of any of the questions involved in this case, even though we conclude to adhere to the rule that reasonable filing fees, as a matter of regulation, may be imposed. It was unnecessary to consider the question at all in that case, and it was not given that careful consideration, either by court or counsel, that would have been given had the question been essential to a determination of the main question involved. This is shown by the fact that a number of the existing cases bearing on the question were not cited to the court. The contention made on behalf of the respondent in the Riter case that the courts which had considered the question had

very generally sustained provisions of statutes imposing fees in excess of a nominal amount, as a matter of regulation, was erroneously accepted.   The fact is that at the time the Riter case was decided the Supreme Courts of Illinois, Nebraska, Tennessee, North Dakota, and South Dakota, a majority of the courts that had considered the question, had held directly to the contrary.

As said by the South Dakota court, in *Ballinger* v. *McLaughlin, supra:* "It is difficult to understand how the courts could formulate a rule of general application by which they shall be guided in determining when the required amount is excessive and when it is not."

In *Socialist Party* v. *Uhl, supra,* the California court said: "The exaction of a fee tends to prevent an indiscriminate scramble for office, where it is fixed at an amount that will impose no hardship upon any person for whom there should be any desire to vote as a nominee for any office, and yet enough to prevent the wholesale filing of petitions for nominations of any one, regardless of whether or not he is a desirable candidate."

If it be a proper rule to apply that the fee may be fixed at such an amount as, while not imposing a "hardship upon any person for whom there should be any desire to vote as a nominee for any office, and yet enough to prevent a wholesale filing of petitions," then the fee of $100 may, I think, be said to be unreasonable, as shown by past experience.   The fee of $50 prescribed by the statute of 1909 appears to have been large enough to have prevented a "wholesale filing of petitions" for the primary election of 1910.   If a $50 fee was sufficient to accomplish this result, what justification can be found for doubling the amount of the fee?

It is said that the statute of 1909, also, required, in addition to the fee, a petition of 3 per cent of the party vote; that this entailed an additional expense and effort, which, when removed, justified the increase of the amount of the filing fee.   I cannot agree with this view.   It may readily be conceded that many candidates might prefer to pay the additional fee rather than to bother with securing a petition, and it may be true that some candidates

would spend more to secure a petition, in some cases much larger than the law required, than the increase in the fee amounted to; nevertheless it is not true that the securing of a petition necessarily involved more than a nominal expense.

The constitutional right of a qualified elector to become a candidate for public office is scarcely less important than his right to vote at an election. This court has repeatedly held that the legislature is without power to infringe the constitutional right of an elector to vote. (*Davis* v. *McKeeby*, 5 Nev. 369; *State* v. *Findlay*, 20 Nev. 198, 19 Pac. 241, 19 Am. St. Rep. 346; *State* v. *Board of Examiners*, 21 Nev. 67, 24 Pac. 614, 9 L. R. A. 385.)

The writ should issue as prayed for.