(72 N. W. Rep. 1022.)

---

STATE *ex rel* ARTHUR TOMPTON *vs.* DAVID DENOYER, *et al.*

Opinion filed November 1st, 1897.

**Allotment Indians—Voting Precincts—Mandamus.**

> Where certain territory was situated within the limits of the County of Benson, in this state, and also within the limits of the Devils Lake Indian Reservation, and where said territory had, under an act of congress, been allotted to certain Indians and persons of Indian descent in severalty, and the preliminary patent therefore issued to such persons, and where said persons were living upon their respective allotments, and farming the same, it was the duty of the county commissioners of Benson county to establish a voting precinct within or for said territory.

**Indians Citizens of the United States.**

> Such Indians and persons of Indian descent, so residing upon lands allotted to them in severalty, and upon which the preliminary patents had been issued, are citizens of the United States, and qualified electors of this state.

**Void Legislation.**

> Section 480, Rev Codes, in so far as it is a restriction upon the right of suffrage, as defined in § 121 of the Constitution of this state, is unconstitutional and void, as not having been adopted by a majority of the voters of this state, voting at a general election, as provided by § 122 of said Constitution.

Appeal from District Court, Benson County; *Morgan,* J.

Application by the State of North Dakota, on the relation of

Arthur Tompton and others, for a writ of mandamus to David Denoyer and others, county commissioners of Benson county.

Judgment for plaintiff awarding peremptory writ of mandamus and defendants appeal.

Modified.

*O. D. Comstock, E. S. Rolfe,* (*Cochrane & Feetham* of counsel) for appellant.

The people of the state have disclaimed all right and title to all lands owned or held by any Indian or Indian tribes within the state. Subdivision 2, § 4, Enab. Act. Subdivision 2, § 203 Const. The allotment of lands in the reservation has not terminated the tribal relations of the Indians. *U. S.* v. *Flournoy*, 71 Fed. Rep. 578. And the United States has never been released from the obligations by which it assumed to preserve these lands for the use and benefit of the Indians. *U. S.* v. *Mullin*, 71 Fed. Rep. 682; *U. S.* v. *Flournoy*, 69 Fed Rep. 892. The title to the land is in the United States. *U. S.* v. *Mullin*, 71 Fed. Rep. 684; *U. S.* v. *Flournoy*, 69 Fed. Rep. 892; *Beck* v. *Flournoy*, 65 Fed. Rep. 35. And the Indian agents have a right to remove all persons upon the reservation contrary to law. *Eells* v. *Ross*, 64 Fed. Rep. 419. State process cannot run there at all in civil or other cases but by a special exception or reservation in the cession. *U. S.* v. *Ames*, 24 Fed. Cases, 14441. The words "absolute jurisdiction and control of congress" as used in the Constitution and Enabling Act mean "exclusive jurisdiction" for all purposes except taxation. *Truscott* v. *Hurlbut,* L. & C. Co. 73 Fed. Rep. 64; *Ry. Co.* v. *Fisher,* 116 U. S. 28, 6 S. C. Rep. 246. And jurisdiction to punish other than Indians for crimes committed on this territory. *Draper* v. *U. S.,* 164 U. S. 910, 17 S. C. Rep. 107; *U. S.* v. *Thomas,* 151 U. S. 577, 14 S. C. Rep. 426; *U. S.* v. *Kagama,* 6. S. C. Rep. 1109; *U. S.* v. *McBrutney,* 104 U. S. 621. The states wherein governmental establishments exist, if jurisdiction over them has been ceded away do not regard them or their occupants as subject to state control. The inhabitants cannot vote or be taxed, nor are they

bound by state laws. *Com.* v. *Clarey*, 8 Mass. 72; *U. S.* v. *Ames*, 24 Fed. Cases 788; *Sinks* v. *Reese*, 19 Ohio St. 306; *U. S.* v. *Cornell*, 25 Fed. Cases 648; *Peo.* v. *Godfrey*, 17 Johns 225; *U. S.* v. *Partello*, 48 Fed. Rep. 676; *U. S.* v. *Bevens*, 3 Wheat 388; *Mitchell* v. *Tibbetts*, 17 Pick 298; *Re Town of Highlands*, 22 N. Y. Supp. 137; *Fort Leavenworth Ry. Co.* v. *Lowe*, 5 S. C. Rep. 1002, 6 Op. Atty's Gen'l. 577; *Lasher* v. *State*, 17 S. W. Rep. 1064. Mandamus will not issue to compel the defendants to perform a function not within the line of their official duties. *McDermont* v. *Dinnie*, 6 N. D. 278, 69 N. W. Rep. 294; *State* v. *Getchel*, 3 N. D. 243, 55 N. W. Rep. 585. The discretion of defendants could in no wise be controlled as to the place they should designate as a polling place. In *Re McCain*, 68 N. W. Rep. 163; *Heintz* v. *Moulton*, 64 N. W. Rep. 135; High Ex. Rem. § 34; Merrill on Mandamus, § 110.

*Tracy R. Bangs*, for respondent.

Section 480, Rev. Codes, passed in 1885, is an attempted restriction upon the right of suffrage, and conflicts with § 122 Const. and is void. The enabling act does not deprive the courts of the state of jurisdiction over the Indian reservation, or over its citizens located thereon. *Draper* v. *U. S.*, 164 U. S. 240; *U. S.* v. *McBratney*; 104 U. S. 621. The duty is imposed by statute upon the county commissioners to provide election precincts. Section 481 Rev. Codes. Section 2005 Rev. Stat. of U. S. These relators are citizens and entitled to vote. Supp. Rev. Stat. U. S. 536; *State* v. *Morris*, 55 N. W. Rep. 1086; *State* v. *Frazier*, 44 N. W. Rep. 471, 28 Neb. 438; *Painter* v. *Ives*, 4 Neb. 128.

BARTHOLOMEW, J. The relators herein are Indians or persons of Indian descent. The defendants are the county commissioners of Benson county, in this state. Relators applied to the proper District Court, by petition, for a writ of mandamus requiring the defendants to establish a voting precinct for certain described territory. The alternative writ was issued, and upon the return day the defendants appeared and made answer. The matter was submitted to the District Court upon stipulated facts, and on

such facts the court issued its peremptory writ, requiring the defendants to establish a voting precinct at a designated point. The question sought to be settled in this litigation is the right of relators to vote in this state. As the question pertains to the sovereign right of suffrage, it is of importance, not only to these relators, but to the state at large; and it has been presented to this court with an ability commensurate with its importance. From the stipulated facts it appears that the territory within and for which the election precinct is desired forms a part of Benson county, and is also within the limits of the Devils Lake Indian Reservation; the defendants, as commissioners of said county, held regular sessions for the transacion of business after January 1, 1896, and prior to the application for the writ, but failed to establish any voting precinct within or for the specified territory; that the relators and many other Indians and persons of Indian descent reside upon the lands described in the petition for the writ; that said lands have been allotted to them in severalty, under certain specified acts of congress; that they have received patents therefor from the United States, as provided in said act of congress; that they reside upon the tracts of land allotted and patented to them severally, and have made improvements thereon, and are engaged in farming and stock raising; that they are not supported in whole or in part by the United States, but support themselves by their aforesaid avocations; that they fulfill all the requirements of said act of congress as to birth, age and residence, and all the residence requirements of the laws of North Dakota, to constitute them legal voters. It also appears that a petition was presented to the defendants praying the establishment of a voting precinct for said territory, and that said petition was denied, while election precincts had been established for all the remaining portions of said Benson county; that relators belong to the Wahpeton and Sisseton bands of Sioux Indians, and that on said reservation there are three persons known as "chiefs," one being hereditary, and two tribal elective chiefs, and that these chiefs exercise sway, so far as the customs and authority per-

mitted to be exercised are concerned, in the same manner that Indian chiefs ruled in years gone by; that the lands allotted to the petitioners have never been taxed in said county, nor have the petitioners ever been taxed in any way in said county. Under these facts and the law, appellants claim that the congress of the United States had exclusive jurisdiction over the territory sought to be included within the said election precinct, and that appellants, as such commissioners, had no right or authority to establish a voting precinct thereon.

The second subdivision of § 4 of the Enabling Act approved February 22, 1889, and under which North Dakota, South Dakota, Montana, and Washington were admitted as states of this Union, provides: "That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States." The people of this state, by the second subdivision of § 203 in their Constitution, disclaimed all right and title to said lands in the precise terms of the Enabling Act, and declared that such Indian lands "shall remain under the absolute jurisdiction and control of the congress of the United States." Since, by the stipulation of facts, it appears that the territory in question was and is within the limits of the Devils Lake Indian Reservation, and is occupied by Indians, it is urged that it comes clearly within the Enabling Act, and is within the absolute jurisdiction of congress,—a jurisdiction so exclusive that no state or county official has any right or authority to perform any act that shall effect said territory or the persons residing thereon. Respondents deny any such extended jurisdiction. Their position is that the absolute jurisdiction and control of congress, as expressed in the Enabling Act, extends

only to the right to control the disposition of the land, and does not necessarily include exclusive jurisdiction and control of the persons occupying the land or of the personal property thereon. They claim that they are citizens of the United States residing within the State of North Dakota, and amenable to all the laws, civil and criminal, of said state, and likewise entitled to all the privileges and immunities conferred by such laws upon other citizens of the United States resident within such state. In 1887 congress passed an act generally known as the "Dawes Bill," entitled "An act to provide for the allotment of lands in severalty to Indians of the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians and for other purposes. The act was approved February 8, 1887. The fifth section declares: "Upon the approval of the allotments provided for in this act by the secretary of the interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." The sixth section reads: "Upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotment shall have been made under the provisions of this act,

or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

The facts show that lands were allotted to these respondents, under the provisions of said act, on November 1, 1892, and that what we may term the "preliminary patents" were issued to them for their respective allotments on April 10, 1893; that they are living upon the lands so allotted to them in severalty, and have improved the same, and are engaged in farming thereon, and are entirely self-supporting. It remains, then, for us to determine whether or not the act of appellants in establishing a voting precinct upon said territory would in any manner conflict with the jurisdiction of congress over said lands, and also whether or not these respondents are legal voters in the State of North Dakota. It is conceded that, under § 481, Rev. Codes, it had become the duty of appellants to divide the entire County of Benson into election precincts prior to the time this application was made, unless they were prohibited from so doing by the acts of congress and the provisions of our State Constitution heretofore mentioned. The question of the extent of the jurisdiction of congress over the lands of the United States and over Indian reservations has been often before the courts, and perhaps not with entirely uniform results. We think it must be conceded that there is a difference between lands ceded to the United States, and actually occupied as a fort, arsenal, dockyard, or some similar purpose, and the public domain generally. In the former cases jurisdiction is exclusive for all purposes. Persons residing

upon such tracts are not regarded as citizens of the state that may surround such tracts. They can claim none of the privileges and immunities given by the laws of such state. Nor can the state courts punish for any crime committed upon the tract by whomsoever committed, and, unless the right is specially reserved, state officials cannot enter upon the tract for the purpose of serving a warrant of arrest for a crime committed elsewhere, or for the purpose of serving any process whatever. *U. S.* v. *Ames*, 24 Fed. Cas. 784 (No. 14,441); *Com.* v. *Clary*, 8 Mass. 77; *Sinks* v. *Reese*, 19 Ohio St. 316; *Mitchell* v. *Tibbets*, 17 Pick 298; *In Re Town of Highlands* (Sup.) 22 N. Y. Supp. 139. But this cannot be true when we speak of the public domain generally, although the title thereto is in the United States, and congress has absolute jurisdiction and control over the disposition thereof. It is common knowledge that the political and judicial jurisdiction of a state extends in full force over all of what is generally known as the "public domain" lying within the geographical limits of such state. All state laws, civil and criminal, are enforced thereon. Improvements thereon are, under our statutes, taxed as personal property, and all personal property maintained thereon is taxable, and persons residing thereon are taxable; yet the land itself is not taxable, nor can the person residing upon such land, until the extinguishment of the title of the United States under some law of congress, do any act that shall affect such title. They cannot sell or incumber the land; yet, other conditions existing, they are none the less citizens of the United States and of the state, and are entitled to the full protection and all the privileges and immunities of the state laws, and their right to vote is never questioned because they reside upon land the title to which remains exclusively under the control of the general government.

Wherein, then, lies the difference in the jurisdiction exercised by the general government over the lands of the public domain and over Indian Reservations or Indian lands? When we turn to the Enabling Act, we see that it required the state to "forever

disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereof shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States." Thus far the statute is dealing with the title to the land only, and the unappropriated public lands and lands owned or held by an Indian or Indian tribes are placed upon the same basis or footing so far as the right of the United States to dispose of the title is concerned. But the statute immediately adds, "and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States." This provision applies to the Indian lands only, and it is not confined to the matter of title. It deals with a jurisdiction that extends to the lands themselves, and must have intended a more enlarged jurisdiction than was conferred by the preceding language. Does it thereby create a jurisdiction as exclusive as in cases of lands ceded to the United States by a state for specific purposes, as hereinbefore considered? The reasons which actuated congress in thus retaining the broader jurisdiction over the Indian lands are perfectly apparent. These Indian lands are now universally held by the Indians under some treaty or contract with the United States, and common good faith required congress to retaiu all the jurisdiction over these lands necessary to enable the United States to fulfill its treaty and contract obligations. Moreover, a well-recognized moral obligation rests upon the general government to care for these unfortunate wards of the nation. This duty cannot be performed unless the general government retains the right to exclude the white race from the Indian lands; otherwise the Indian will be speedily dispossessed. Government must retain the power to establish agencies, erect school houses and churches, and introduce all desired civilizing influences, without being in any manner dependent upon the state. This increased jurisdiction was required for the best welfare of the Indian, and was in line with

the government policy which seeks to convert the nomadic savage into the civilized citizen.

The powers and duties of the United States in this behalf are clearly set forth and defined in *Beck* v. *Real Estate Co.*, 12 C. C. A. 497, 65 Fed. Rep. 35, and *U. S.* v. *Flournoy Live-Stock & Real Estate Co.*, 69 Fed. Rep. 892. These cases involved the validity of certain leases made by Winnebago Indians of lands that had been allotted to them in severalty, under the provisions of the "Dawes Act"; the lands being within the limits of the Omaha and Winnebago Indian Reservation, in the State of Nebraska. The leases were held to be absolutely void, as, under the terms of the act, the United States held the title in trust for the Indians for the period of twenty-five years, and all contracts made during said period with other than native Indians were declared null and void. And the cases held that these provisions were necessary in order to enable the United States to fulfill its treaty obligations, and carry out its policy of civilizing the Indians. The case of *U. S.* v. *Mullin*, 71 Fed. Rep. 682, which arose over allotments on the same reservation, went one step further, and held that the United States was not relieved from its duties of guardianship and protection of the members of an Indian tribe, assumed by treaty with such tribe, in consequence of the Indians becoming citizens of the United States. But in neither of these cases is it decided, and in the case in 69 Fed. Judge Shiras expressly declines to decide, whether or not lands thus allotted cease to be a part of the Indian reservation. Nor do we think that question is or can be material in the case at bar, because, under the Enabling Act and under the disclaimer in our Constitution, "Indian lands," as the words are there used, include all lands "owned or held by any Indian or Indian tribes"; so that, in order that land should be under the absolute jurisdiction and control of congress, it was not necessary that it be included within any reservation, but only that it be "owned or held by an Indian." It is certainly favorable to these appellants to hold that congress has the same jurisdiction over alloted lands within the limits of an original

reservation that it has over unallotted lands therein.    In *Railway Co.* v. *Fisher*, 116 U. S. 28, 6 Sup. Ct. 246, the jurisdiction of the Territory of Idaho over an Indian reservation was before the court.    In that case there was no specific reservation of jurisdiction in the United States.    The reservation arose from treaty stipulations.    But it is there said:    "As these treaty provisions have the force and effect of law, it is insisted that the reservation is excluded from the general jurisdiction of the territory as effectually as if the exclusion was made in specific terms.    To uphold that jurisdiction in all cases and to the fullest extent would undoubtedly interfere with the enforcement of the treaty stipulations, and might thus defeat provisions designed for the security of the Indians. But it is not necessary to insist upon such general jurisdiction for the Indians to enjoy the full benefit of the stipulation for their protection.    The authority of the territory may rightfully extend to all matters not interfering with that protection."    The cases of *U. S.* v. *McBratney*, 104 U. S. 621, and *U. S.* v. *Kagama*, 118 U. S. 375, 6 Sup. Ct. 1109, each recognize the fact that the criminal jurisdiction of a state or territory extends over the territory embraced in an Indian reservation embraced within such state or territory; but in these cases, also, the jurisdiction of the United States was based upon treaty stipulations.    But in the case of *Truscott* v. *Cattle Co.*, 19 C. C. A. 374, 73 Fed. Rep. 60, the question of jurisdiction arose under this same Enabling Act.    The case arose in the Crow Indian Reservation, in Montana.    The Constitution of Montana contains a like disclaimer with that found in our Constitution, and the exclusive jurisdiction of congress over the reservation was there insisted upon.    But the court held that this exclusive jurisdiction did not exist, and that the jurisdiction of the state extended over the reservation for the purpose of taxing cattle not the property of Indians, maintained thereon, and that the officers of the proper county might proceed by levy to collect such taxes.    To same effect is *Torrey* v. *Baldwin*, (Wyo.) 26 Pac. Rep. 908.    The same question again arose under the same Enabling Act in *Draper* v.

*U. S.,* 164 U. S. 240, 17 Sup. Ct. 107. Draper, a negro, had been indicted, tried, and convicted, and sentenced to death for the alleged murder of another negro, committed upon the Crow Indian Reservation, in Montana. He was tried in the Federal Court, and moved to arrest the judgment for want of jurisdiction of said court to try the offense. His motion being denied, the case went to the Federal Supreme Court, and the unanimous opinion of that court was written by Mr. Justice White. After showing that such reservation was properly a part of the State of Montana, the learned justice cites *U. S.* v. *McBratney, supra,* as showing that, unless territory is excluded therefrom by express exception in the Enabling Act, the states are admitted into the Union upon equal footing, and that footing includes criminal jurisdiction over all its citizens throughout the entire territory within its limits, including Indian reservations, and that the courts of the United States have power to punish for crimes committed within the reservation only so far as may be necessary to carry out such provisions of the treaty with the Indians as may remain in force. We quote from the opinion: "*U. S.* v. *McBratney* is therefore decisive of the question now before us, unless the Enabling Act of the State of Montana contained provisions taking the state out of the general rule, and depriving its courts of the jurisdiction to them belonging, and resulting from the very nature of the equality conferred upon the state by its admission into the Union. Such provision is sought here to be evolved from certain provisions of the Enabling Act of Montana, which were ratified by the ordinance of the convention which framed the Constitution of that state." The learned justice then quotes that portion of the Enabling Act heretofore quoted herein, and proceeds: "As equality of statehood is the rule, the words relied upon to create an exception cannot be construed as so doing if, by any reasonable meaning, they can be otherwise treated." A reference is made to the act of 1887, which we designate as the "Dawes Bill," and the opinion proceeds: "The act in question contemplated the gradual extinction of Indian reservations and

Indian titles by the allotments of such lands to the Indians in severalty. It provided in § 6 'that, upon the completion of said allotments and the patenting of said lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside.' But the act at the same time put limitations and restrictions upon the power of the Indians to sell, incumber, or deal with the lands thus to be allotted. Moreover, by § 4 of the act of 1887, Indians not residing on a reservation, or for whose tribe no reservation had been provided, were empowered to enter a designated quantity of unappropriated public land, and to have patent therefor; the right, however, of such Indian to sell or incumber being regulated by provisions like those controlling allotments in severalty of lands comprised within a reservation. From these enactments it clearly follows that at the time of the admission of Montana into the Union, and the use in the Enabling Act of the restrictive words here relied upon, there was a condition of things provided for by the statute law of the United States, and contemplated to arise where the reservation of jurisdiction and control over the Indian lands would become essential to prevent any implication of the power of the state to frustrate the limitations imposed by the laws of the United States upon the title of lands once in an Indian Reservation, but which had become extinct by allotment in severalty, and in which contingency the Indians themselves would have passed under the authority and control of the state. It is also equally clear that the reservation of jurisdiction and control over the Indian lands was relevant to, and is explicable by, the provisions of § 4 of the act of 1887, which allowed non-reservation Indians to enter on, and take patents for, a certain designated quantity of public land. Indeed, if the meaning of the words which reserved jurisdiction and control over Indian lands contended for by the defendant in error were true, then the State of Montana would not only be deprived of authority to punish

offenses committed by her own citizens upon Indian Reservations, but would also have like want of authority for all offenses committed by her own citizens upon such portions of public domain within her borders as may have been appropriated and patented to an Indian under the terms of the act of 1887. The conclusion to which the contention leads is an efficient demonstration of its fallacy. It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the Enabling Act, by which the State of Montana was admitted into the Union, adequately explains the use of the words relied upon, and demonstrates that, in reserving to the United States jurisdiction and control over Indian lands, it was not intended to deprive that state of power to punish for crimes committed on a reservation or Indian lands by other than Indians or against Indians, and that a consideration of the whole subject fully answers the argument that the language used in the Enabling Act becomes meaningless unless it be construed as depriving the state of authority to it belonging in virtue of its existence as an equal member of the Union."

These authorities establish firmly the proposition that the jurisdiction reserved by the Enabling Act was not an exclusive jurisdiction. It did not take Indian lands out of the jurisdiction of the state where located, in the sense that the lands in another state are excluded. The United States retained all jurisdiction necessary for the disposition of the land and the title thereto; all jurisdiction necessary to enable it to carry out all treaty and contract stipulations with the Indians; all jurisdiction necessary to enable it to protect and civilize its unfortunate wards. But the state had jurisdiction to tax the property of its citizens within the reservation, to enter thereon for the purpose of enforcing, by levy and sale, the collection of such tax. It had jurisdiction to punish its citizens for crimes committed one against the other thereon. And the principle of these decisions logically and necessarily lead further, and give the state the right to extend to its citizens lawfully upon such Indian lands all the privileges and immunities

of the laws of the state, where the same in no manner conflict with the reserved jurisdiction of the United States. And this construction places the Enabling Act in entire harmony with the Dawes Bill. The latter declares that Indians to whom allotted lands have been patented "shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside." It follows, then, that if these relators were citizens and legal voters in this state, it was the duty of appellants to establish a voting precinct for them.

Were these relators voters? Under § 480, Rev. Codes, they would not be voters unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent. Appellants contend that, under the stipulated facts, these respondents do not fulfill the requirements of the statute. Respondents, without admitting the appellant's contention, urge that the statute itself is unconstitutional. Section 121 of our Constitution defines who shall be deemed qualified electors, and the first class is "Citizens of the United States." The sixth section of the Dawes Act declares that these relators are citizens of the United States. Hence they must be qualified electors, unless barred by § 480, Rev. Codes. Such section is clearly a restriction upon the right of suffrage, as established by said § 121 of the Constitution. But § 122 of the Constitution declares: "* * *. But no law extending or restricting the right of suffrage shall be in force until adopted by a majority of the voters of the state voting at a general election." It is conceded that § 480, Rev. Codes, has never been so adopted; hence, in so far as it restricts the constitutional right of suffrage, it is of no effect. The points that we have discussed were before the Supreme Court of Nebraska in *State* v. *Norris*, 55 N. W. Rep. 1086, and the decision in that case is direct authority for the conclusions we have reached. The order of the District Court is modified in so far as it required appellants to establish a voting place at a particular point within said precinct, as that matter

rest in the discretion of appellants, and could not be controlled by mandamus.

In all other respects the order appealed from is affirmed, and the peremptory writ of mandamus, as thus modified, must be obeyed. All concur.

Modified and affirmed.