STATE EX REL. MILLER, Attorney General, et al. v. FLAHERTY, County Auditor.

(41 L.R.A.(N.S.) 132, 136 N. W. 76.)

**Elections — nominations — suffrage — constitutional provisions.**

1. Chapter 213 of Session Laws of 1911, providing for party enrolment of electors by assessors before primary election, and prescribing the form of affidavit to be so required of each elector to entitle him to enrolment as a partisan, and to qualify him to vote at the coming primary election, construed and held:—

The legislature has the right to require nomination to be made at primary

---

Note.—The authorities on the constitutionality of primary election laws are collated in a note to the above case as reported in 41 L.R.A.(N.S.) 132, which is supplementary to the note in 22 L.R.A.(N.S.) 1136, on the same subject.

As to the constitutionality of legislation affecting party representation on official ballot, see note in 35 L.R.A.(N.S.) 353.

For the question whether primary elections are elections within Constitution or statutes relating to elections generally, see note in 18 L.R.A.(N.S.) 412.

As to constitutionality of a statute prohibiting the nominating, recommending, or censuring of specified officers by certain organizations or at designated elections, including primary elections, see note in 23 L.R.A.(N.S.) 839.

The question of the constitutionality of legislation restricting candidates to one place on ballot is the subject of a note in 37 L.R.A.(N.S.) 825.

elections by the use of a ballot, and may provide that such election shall be conducted within organized political parties, and may deny the right to vote to those electors not belonging to any organized political party, and may require as a reasonable test of party fealty that the elector shall subscribe an oath stating that he belongs to an organized political party, and requiring him to designate it therein by name.

(a) The law requiring such a test and making the required oath a condition precedent to the right of an elector to participate at the party primary election is not unconstitutional as prescribing an added franchise requirement, or as restricting the right of suffrage, or as violating the secrecy of the ballot, within the meaning of §§ 121, 122, and 129 of our state Constitution.

(b) Said constitutional provisions, a part of art. 5 of the state Constitution, are applicable to the extent of limiting such primary election to constitutional electors and guarantying a secret ballot at primaries, but are limited in application by the purpose for which the election is by the legislature provided, the power to declare such purpose being reserved to it by said constitutional provisions. The constitutional rights of the elector are not paramount to such contemplated legislative purpose; and a party primary election law is not rendered unconstitutional because the right of suffrage at the primary is made dependent upon the assertion of a partisan belief by the elector, and because such election regulations forbid an elector from voting who belongs to no political party.

**Elections — nominations — electors.**

2. The portion of the statutory affidavit exacted upon enrolment, providing for proof of naturalization, is unconstitutional, because in operation it disfranchises from participating in any party primary election those electors naturalized by being within the terms of the act of Congress naturalizing certain foreign born residents within the limits of this state at the time of its admission into the Union. That said act is likewise void because it excludes those electors similarly naturalized by act of Congress because of having been residents of other states upon the admission of such states into the Union. Except as to such feature of the statute requiring proof of naturalization, the statute remains unaffected and in force.

**Elections — nominations — electors.**

3. The statute in question contemplates that both the minor reaching majority on or prior to election day, but after the return of the enrolment books to the auditor, and any male person of legal age naturalized by court decree during said period, may vote, and does not discriminate between the new voter and such naturalized elector, both of whom may participate at the primary election upon taking the oath required by the act, and similar to that provided by § 738, Rev. Codes 1905.

Opinion filed May 17, 1912.

Application for original writ to compel the county auditor of Burleigh County to conform to the provisions of chap. 213 of Session Laws 1911.

Writ granted.

*Palda, Aaker, & Greene,* of Minot, attorneys for relators.

*Andrew Miller,* Attorney General, *Alfred Zuger,* and *C. L. Young,* Assistant Attorneys General, and *John Carmody,* all of Bismarck, attorneys for respondent.

Goss, J.   This is an application in the name of the attorney general and an elector as relators for an original writ against the county auditor of Burleigh county.   The application charges, and it is admitted by the pleadings, that the respondent is about to ignore the provisions of an act passed by the last legislature, wherein it is the respondent's duty to furnish the assessors of Burleigh county with enrolment blanks with directions to use the same in enrolling in some political party each elector assessed, according to his political belief, and obtain from such elector an affidavit stating the party with which he affiliates, the affidavit to be used as a party enrolment list at the coming primary election.   Such enrolment is designed to be a classification of the electors as to their political belief, to be binding upon them at said primaries according to the enrolment so previously made.   The individual enrolled, by virtue of his own declaration as a Republican, if such, can vote none but a Republican ballot in the forthcoming primaries; the same with a Democrat so enrolled.   There is no provision in the law for the enrolment of one as an independent voter, or one having no political belief; and independents are accordingly barred from voting at the primaries.   To those familiar with recent occurrences and proceedings of political parties had under our primary election law it is wholly unnecessary to state the reasons for such enrolment.   For the sake of the record we will state that this act is to prevent the apparent habit, often indulged on the part of some voters attending primaries, of calling for and voting the primary ballot of a party other than that to which in fact they belong, resulting in a minority party participating to a great extent in selecting the nominees of the majority party, with the result that, in the general election following, a seemingly insignificant minority party elects its nominees to the defeat of those of the

preponderating party at the primary. Previous legislatures have endeavored to remedy this defect in our primary system, by requiring first a 5 per cent and then a 30 per cent party vote to be cast to nominate. Even this failed to keep political parties within their respective party beliefs; and this court has had occasion to pass upon the constitutionality of such percentage provisions in State ex rel. Hagendorf v. Blaisdell, 20 N. D. 622, 127 N. W. 720, and again in State ex rel. Montgomery v. Anderson, 18 N. D. 149, 118 N. W. 22, overruled in State ex rel. McCue v. Blaisdell, with the result that the last word of this court (though differently constituted than at present) is to the effect that such a requirement is unconstitutional. Of the soundness of this conclusion we express no opinion, and confine ourselves to the trouble before us as reflected by the contentions herein urged.

The last legislature has, by chap. 213, required the assessors, as above stated, to make a party enumeration and enrolment, and prescribed an affidavit in the following form to be taken before the assessor:

State of North Dakota ⎫
County of ——————— ⎬ ss.
⎭

I, the undersigned, elector, do solemnly swear (or affirm) that my name and signature as signed below is my true name and signature. If I have not personally signed it, it is because ——— and it was signed at my request by the attesting officer. My age is ——— years and occupation ———; nativity ——— naturalized or declared by intention in ——— court, in ——— county, ——— state, on ——— 19—, as appears by the naturalization papers exhibited herewith. Present residence is in section ———, township ———, range ———, ——— county, North Dakota; of (if city or town) at No. ——— street, in the city of ———, post office address ———. I belong to the ——— party; that I have resided in this state for one year immediately preceding this election. In testimony whereof I sign my name two times.

(1) ———————                           (1) ————————
                                         (2) ————————
                                                Elector.

The legality of every innovation in suffrage usually is challenged before acceptance, and this piece of legislation is before this court in this proceeding by original writ. The grounds for assumption of jurisdiction are those asserted in State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141, and State ex rel. Shaw v. Thompson, 21 N. D. 426, 131 N. W. 231, and other cases cited therein. A state wide primary is about to be held. The office of the attorney general of this state has made generally public throughout the state an opinion to the effect that chap. 213 of the Laws of 1911, applying generally to the coming primary, is void as unconstitutional; that the assessors throughout the state are about to commence their duties in several thousand assessor districts, and know not whether to follow the law as written or the attorney general's advice, and that a corresponding confusion exists as to the validity of the procedure to be used at the coming primary election. If this question remains undetermined, the result will be a want of state wide uniformity in suffrage proceedings, and consequent doubt throughout as to legality of many, if not all, nominations made at the coming primary. Hence, the electorate of the state is interested as its right of franchise is uncertain until made so by a determination of the legality of the act in question. The sovereignty of the state being thus affected, it is a proper cause for the exercise of the prerogative power by prerogative writ, and original jurisdiction is assumed to determine this matter.

The constitutional provisions involved are those contained in the second amendment to our state Constitution, defining electors, and §§ 122, 124, and 129 of our state Constitution. In brief the portions to be herein considered are § 121, as amended by art. 2 of amendments, reading: "Every male person of the age of twenty-one years or upwards belonging to either of the following classes, who shall have resided in the state one year, and in the county six months, and in the precinct ninety days, next preceding any election, shall be a qualified elector at such election." Of § 122, the following: "The legislative assembly shall be empowered to make further extensions of suffrage hereafter at its discretion to all citizens of mature age and sound mind not convicted of crime, without regard to sex; but no law extending or restricting the right of suffrage shall be in force until adopted

by a majority of the electors of the state voting at a general election."
Section 124 provides: "The general elections of the state shall be
biennial and shall be held on the first Tuesday after the first Monday
in November." Section 129 provides: "All elections by the people
shall be by secret ballot, subject to such regulations as shall be provided
by law." These are all the constitutional provisions involved in this
decision.

The attorney general has appeared on behalf of the respondent in
this case, though for formal purposes, lending his name as a relator.
Respondent takes the position that a primary election is an election
within the meaning of that term as used in the Constitution, and the
qualifications of electors at such primary are the same as at a general
election; and that chap. 213 of the Laws of 1911, by exacting an oath
of party allegiance as a condition precedent to the right to vote at the
primaries, is in effect requiring an additional qualification of an elec-
tor, as a condition precedent to his right to vote, besides those mentioned
in § 121, defining his qualification and guarantying every male person
with those qualifications who shall have resided in the precinct for a
certain time "next preceding any election shall be a qualified elector
at such election." Logically the first question to determine is whether
the primary election is an election within the meaning of § 121, as
amended. To determine this we must consider: (1) The statutory
intent under which the particular right to suffrage is created and the
intended rights of the individual and political party thereunder;
(2) what is contemplated under the constitutional elective franchise .
scheme under art. 5, with reference to elector's rights; (3) its appli-
cation or not to this class of suffrage rights.

Let us first examine the scheme of the primary system. Previous
to primary election reform the right of the legislature to provide all
things necessary to the nomination of officials to be thereafter elected
was not doubted. The legislature possessed plenary power in the
matter; and legislation defining the manner and procedure under the
caucus and convention system has always been held to be the exercise
of legislative discretion on a purely political question, without con-
stitutional limitation, and concerning which courts are without author-
ity to do other than declare merely the interpretation of the statutes
without regard to its reasonableness or unreasonableness in application

or practical effect. If its results be undesirable the legislature was alone responsible to the people who constitute the power to correct the abuse. Such was the law for a considerable period. Within the last generation, obedient to a demand for general election reform, an application of the Australian ballot election system to nominations for office has naturally evolved, with the result that most, if not all, the states have some form of elective system in use in choosing nominees for office, supplanting thereby the former caucus and convention system. And to-day we hear a desire expressed for a presidential primary election nation wide in operation. In our state the primary is the means of nomination of all officers, state, district, and county, as well as the method of choice by election, instead of nomination, of all party committee men and delegates belonging to the party organizations of those parties entitled to participate at the primaries. The election is held at public expense and is state wide, all nominations occurring throughout the state at the same election. In one sense the state-wide primary is a state-wide election. As to time and method used to accomplish the results it is such. But as to purpose and results achieved, as to nominations made, it is in no sense an election, unless it be a party or partisan election. Its purpose as expressed in every measure providing or defining it is declared to be "for the selection of candidates for election by popular vote and relating to their nomination, and the perpetuation of political parties." Session Laws 1907, chap. 109, and Session Laws 1905, chap. 109. In the light of the history of that which in purpose is supplanted, as well as in definite terms, the only intent deducible from the statute is that it is party nomination by popular vote of the electors of the parties entitled to use the primary election machinery provided. By affording a primary election within which partisans may participate according to their party belief, it cannot be said that any election is intended to be open to all electors, regardless of party belief or party affiliation. The mere fact that all political parties entitled to recognition under the primary laws as parties hold their party nominating election at which their respective party adherents may on the same day participate in their proper political parties, in no wise changes the construction or effect to be given thereto from what it would have been had the legislature provided instead that, on the first Tuesday in May, the Republican party of the state should hold a party primary

at which Republican electors only should be eligible to participate, to be held for the purpose of nominating the nominees of that party to be by said party presented to the state-wide electorate in the general fall election; and that on the second Tuesday in May a similar Democratic state-wide primary should be held open only to Democratic electors, whereby Democratic nominees should be chosen as nominees on the general fall election ballot; and that on the third Tuesday in May the socialist party should likewise choose its nominees for office for the general fall election. Under such regulations no one would be bold enough to assert that any elector without any party belief whatever had any constitutional right to participate in any of said primaries, because, forsooth, he may be an elector within the meaning of § 121 of our Constitution. Nor could it consistently be urged that as an elector he had a right to participate in all of them; as to so assert would be to destroy the plain purpose of party separation by permitting the destruction of all parties. Surely such an interpretation would not come within the meaning of the preamble of our legislation, declaring the object of the law to be the perpetuation of political parties. Nor would an elector be heard to assert under such conditions, with party primaries held at separate times, that no right to challenge his political belief or affiliation could legally be provided, because § 129 of our Constitution assured him of his right to keep secret his political belief, and vote as early and as often as he pleased, by its declaration that "all elections by the people shall be by secret ballot." He would straightway be told that if he would partake he must declare himself on the vital question of his political belief, the test of his right to participate by ballot. His plea would receive as short shrift as that of his plea of right to vote because of being an elector. Nor would any court in Christendom, from the statutory intent above, by any process of reasoning, be justified in holding that voter's right under those circumstances to be invaded by any of the constitutional provisions here asserted, i. e., that of the right of secrecy of ballot; also that an additional qualification is unconstitutionally required of the voter as a condition precedent to his right to participate in an election within the contemplation of such constitutional provisions. And the case at bar is exactly parallel with the one above assumed. Because the primaries of the various parties are consolidated and held under the same election ma-

chinery at the same time, though separately by means of party ballots, cannot change the character of the election from that of a strictly party primary, wherein a test of party fealty by oath or declaration of principles may be required as a condition precedent, or proof of necessary partisan qualification of the elector, to participate therein with his co-partisans, into a so-called general election, subject to and within the meaning of the constitutional provisions applicable to general elections. Such a conclusion is impossible by any system of logical reasoning or by any method other than flagrant disregard of the expressed legislative purpose of the primary election statute, the reason for their existence, their practical operation, the assumption that a nomination is a species of election and amounts to, by bald assertion unsupported by fact, reason or principle, the casting of a mantle of constitutional protection over something utterly foreign to the statutory intent, without grounds therefor unless it be in anticipation that some future legislature will so far forget its responsibilities to the people as to, in the exercise of its discretion upon a purely political subject-matter, undertake to place in vogue restricted voting at the primaries. It is not our province to either legislate or amend the Constitution in this way. "Sufficient unto the day is the evil thereof." And should such conditions ever arise, an intelligent electorate will doubtless be all sufficient to meet the emergency. The primary statute was enacted under the supposition that art. 5 of the Constitution does not apply.

As further evidencing the legislative intent, notice also that under our present existing primary election laws two classes of primary elections are now simultaneously held; namely, the nonpartisan judiciary primary, a complete separate election at which no test of party fealty can be exacted and is in express terms prohibited; the object of which act is to nominate in a nonpartisan manner, regardless of political affiliation, candidates to be elected in the fall at a similar nonpartisan election then held simultaneously with the general election; in addition, simultaneously there is held the partisan primary, at which the personnel of two or more separate party tickets is chosen to contend for office by election at the ensuing general election upon party platforms. That such elections, though held together, are in law separate elections, see State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, where it was held that a change of county boundaries

23 N. D.—21

amounting to county division and the formation of new counties under § 168 of the Constitution, and therein required to be submitted to the electors and adopted by them at a general election, was no part of the general election at which the question was submitted; but, instead, was a special election simultaneously held upon that one matter, at which a majority only of the votes cast thereon (or in said special election) was necessary, and county division was legally carried when a majority of the votes cast on the division proposition voted affirmatively thereon, although such affirmative votes were not in fact a majority of all votes cast at the general election simultaneously held. Then, again, in State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141, this court again illustrated the point under discussion. At the 1908 June primaries no senatorial nominee received the requisite per cent of plurality of vote to entitle him to nomination, and the law provided for the resubmission of the contest between the two candidates receiving the greatest number of votes again at the general election in November. It was held "that the general election, in so far as it relates to the choice of candidates for the office of United States Senator, is a mere continuation of the primary election." And the elector was subject to the provisions of the primary election as to challenge and test oath concerning party affiliation, the same as he was at the preceding June primaries, holding squarely that such election so far as the choice for United States Senator was concerned was a separate primary election under different constitutional regulations than the general election of officers.

From the standpoint of political parties, and the legislative intent to recognize and perpetuate them as governmental agencies, relator's contention then cannot be upheld. But how about the constitutionality of the statute from the view point of the rights of the constitutional elector? Does the full enjoyment of his constitutional rights bar legislation granting partisan electors the privilege of use of the ballot as election machinery, thereby rendering primary elections within political parties unconstitutional?

Our constitutional elective franchise scheme, as contained in art. 5, is that all persons possessing certain qualifications as to citizenship, age, and residence shall be electors, and as such possess a constitutional right of franchise whenever general suffrage rights are permitted in

governmental affairs. This right of franchise of the elector cannot be extended or restricted. By extension is meant that this right cannot be granted in such governmental affairs to others than electors. By restriction of the right of suffrage is meant a denial of that right under such circumstances to any constitutional elector.

This constitutional scheme further comprehends that the exercise of suffrage shall be had at elections, and recognizes two classes of elections, general and those not general. Section 124 fixes the time for the holding of general elections, and with this the legislature has nothing to do other than provide the means and regulations necessary to its conduct, and prescribe what officers shall then be elected. Other elections are by inference contemplated as permissible, for instance, evidenced by § 129 in prescribing that "all elections by the people shall be by secret ballot, subject to such regulations as shall be provided by law." Aside from constitutional general elections, the purpose of other elections is left to the legislature as the power to judge of their necessity. Certain it is, then, that if a primary election falls within the term "any elections" so as to be a contemplated constitutional election, the purpose for which it may be held was left a matter to be fixed by the legislature, and that body was not intended to be by the Constitution limited so far as such purpose was concerned. While the purpose of an act may be wholly immaterial if the act be unconstitutional as violating some express or implied constitutional requirement or prohibition, yet the purpose here being left to legislative discretion, it is by the Constitution in a sense recognized, and these provisions are to be considered therewith, and are not to be unnecessarily held to limit the purpose by construction or unreasonable application, or by application not plainly or by necessary inference within its terms. The primary election statutes have as a principal purpose the regulation of the franchise of electors within party limits. The elections so provided concern primarily the rights of parties, and only incidentally those of the individual elector. The primary is not held to afford an elector as such merely a chance to exercise his right of suffrage, but, instead, an opportunity to participate in the proceedings and acts of a political party. This he does by exercising his right to vote, but within that party. Legislative discretion has recognized the party right as to method of nominating officers as well as promulgating its political doc-

trines and the application of them as a governmental force. The legislative purpose is that the rights of the party are paramount to the individual party member as to nominations made and other party matters transacted by means of the primary. If the party primary therefore is an election within the term "any election," it is one within the power of the legislature to authorize and confine within party limits, and its purpose must be considered as sanctioned by and within the provisions of art. 5 of the Constitution. To hold the contrary is to invalidate every primary election statute *in toto*. Deny constitutional recognition of purpose of the election, and apply the constitutional definition of elector, and hold that by virtue of being an elector he shall be "deemed a qualified elector at such election," and our whole primary election system must fall, because the right to participate depends not on the elector's constitutional rights so defined alone, but on added qualifications of partisanship. We believe the purpose of such an election should determine the limits within which the elector's constitutional right of franchise is to be measured, and so long as that purpose is not unconstitutional in itself the elector's rights should be held, as intended by the Constitution, to be subordinate to the purpose of the election, because, in fact, his right of suffrage arises not wholly from his being a constitutional elector, but instead, in part, from the law permitting him to exercise it in such particular instance for such particular purpose. If he has no party belief whatever, denial of his right to participate in a partisan election does not deny him any right, legally or morally, existing to him merely as an elector. The recognition by the legislature of the existence and rights of a political party cannot devest an elector who has no political belief of any partisan rights. As the party exists for party purposes, incidental to governmental benefit, the individual elector without the party cannot complain of being barred therefrom by his own failure to entertain a partisan belief. Political parties have existed as recognized and necessary instrumentalities of our representative government for a hundred years. They are mentioned in our constitutional debates. Our Constitution was framed and adopted with knowledge of and with reference to them. We cannot reasonably conclude these suffrage provisions were intended to so exaggerate the franchise privilege of the individual as to obliterate them or thwart any legislative purpose to perpetuate political par-

ties. While courts, as in State ex rel. McGrael v. Phelps, 144 Wis. 1, 35 L.R.A.(N.S.) 353, 128 N. W. 1041, assert that political organizations "are not the subjects of constitutional care," but that it "deals with the right to vote," still every holding is to the effect that party rights are constitutionally recognized under or as an incident arising from the guaranties of § 10 of the constitutional Bill of Rights, that the right of assembly and petition of citizens for the common good shall not be denied.

We have discussed the rights of the individual and the political party from the standpoint of each, and considered the constitutional questions as the legislature construed them, evident from the general plan of party primaries for nominating purposes, and also the same questions from the elective franchise scheme contemplated by art. 5 of the Constitution. We will now thereunder define the rights of the elector and the political party in the light of court interpretation.

Many courts lay down the broad rule that such constitutional provisions are applicable only to general elections, and therefore do not apply to primary elections. As illustrative we quote from Riter v. Douglass, 32 Nev. 400, 109 Pac. 444: "That a primary election of candidates is not an election of officers within the meaning of the constitutional test has been sustained by an overwhelming weight of authority in states with similar constitutional provisions to those contained in the Constitution of Nevada." Citing Line v. Election Canvassers (Line v. Waite) 154 Mich. 329, 18 L.R.A.(N.S.) 412, 117 N. W. 730, 16 Ann. Cas. 248; Montgomery v. Chelf, 118 Ky. 766, 82 S. W. 388; State ex rel. Gulden v. Johnson, 87 Minn. 221, 91 N. W. 604, 840; State ex rel. Webber v. Felton, 77 Ohio St. 554–578, 84 N. E. 85, 12 Ann. Cas. 65; Dooley v. Jackson, 104 Mo. App. 21, 78 S. W. 333. "Any reasonable test of party affiliation may be required by the legislature of those who desire to participate in the primary elections of the various parties." Citing State ex rel. Zent v. Nichols, 50 Wash. 508, 97 Pac. 728; State ex rel. Labauve v. Michel, 121 La. 374, 46 So. 430; State ex rel. Adair v. Drexel, 74 Neb. 776, 105 N. W. 174; Hopper v. Stack, 69 N. J. L. 562, 56 Atl. 1; Morrow v. Wipf, 22 S. D. 146, 115 N. W. 1121; Rouse v. Thompson, 228 Ill. 522, 81 N. E. 1109. The following is from the opinion in Morrow v. Wipf, 22 S. D. 146, 115 N. W. 1121: "The contention [the same

as advanced in the instant case] is not tenable. It ignores the substantial distinction between the nomination of a candidate and the election of a public officer. Regarding legislative control of party nominations, this court has said: 'It is for the party to nominate; for the people to elect. The question is not who shall be chosen to [fill] any particular public office; that is for the voters of all political parties to determine at the polls. It is simply who shall represent the organization as its nominees, and certaintly the determination of that question should be controlled by the action of the party itself. Otherwise party nominations are impossible. To what extent, if at all, the rights of organized political parties should be recognized and regulated by law is a matter of public policy, to be determined by the legislative department—a matter which does not concern this court. . . .' State ex rel. Howells v. Metcalf, 18 S. D. 393, 67 L.R.A. 331, 100 N. W. 923. . . . Undoubtedly the qualifications of an elector, as defined by the Constitution for the purposes contemplated by its provisions relating to the elective franchise, are exclusive and conclusive. . . . If an elector as such formerly did not and would not now in absence of the legislation under discussion possess a constitutional right to participate in the proceedings of an organized party of which he is not a member, it is difficult to understand how he has been injuriously affected—difficult to understand how anyone can be deprived of something he never possessed. There having been no constitutional limitations upon the power of the party with respect to the qualifications of its members, it would seem that if the legislature has power to legislate on the subject at all, its power also is without limitation so far as concerns the rights of the individual elector." In State ex rel. Labauve v. Michel, 121 La. 374, 46 So. 430, that court says: "The right of the legislature to require that nominations shall be by primary, and to prescribe additional qualifications to the voters for participating in same, has been recognized by the supreme courts of several states and denied by the supreme court of only one state." Citing State ex rel. Runge v. Anderson, 100 Wis. 533, 42 L.R.A. 239, 76 N. W. 482; State ex rel. McCarthy v. Moore, 87 Minn. 308, 59 L.R.A. 447, 97 Am. St. Rep. 702, 92 N. W. 4; People ex rel. Coffey v. Democratic General Committee, 164 N. Y. 335, 51 L.R.A. 674, 58 N. E. 124 (an opinion by Judge Parker, the one time Democratic nominee for President),

where in it is said: "These acts [primary election laws] recognize the equal importance of primary and general elections, and model the conduct of the former upon the general lines of conduct of the latter. They provide for the enrolment of the voter, and the only exaction permitted precedent to his right to enroll is that he shall express an intention to support generally at the next general state or national election the nominees of such party for state or national offices;" and holding such a test valid as against the attack made in this case on this statute. Judge Parker further expresses the idea of a primary law as one "to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards," and it would be strange indeed if the Constitution had made such a scheme impossible. See also Supper v. Stauss, 39 Pa. Super. Ct. 388; and Ladd v. Holmes, 40 Or. 167, 91 Am. St. Rep. 457, 66 Pac. 714.

We quote from 15 Cyc. 332, 333: "Unless it is expressly made so, a general election law is not applicable to primary elections, which are merely creations of political parties and associations, and may be held at such times and places and on such terms and conditions as may seem fit. But the legislature may recognize the existence of political parties, and within reasonable limits regulate the means by which partisan efforts shall be protected in exercising individual preferences for party candidates. And this is the general purpose of primary election laws, which are designed to secure to individual voters a free expression of their will. Among other things the primary election laws usually make provision for the enrolment of the voters of the different political parties in order to prevent all persons whatever from voting in the party primaries except such as are entitled to do so."

The court of this state has twice had occasion to pass upon the reasonableness of fees exacted of candidates at primary elections for filing of petitions, and held that such a fee to be calculated upon a percentage of one year's salary of the office aspired to was an arbitrary, unreasonable condition upon the right of an aspirant for office, and accordingly void. Although the questions here involved were not necessary to a decision of those questions, the court in the former held a primary election to be an election within the meaning of § 121 of the state Constitution. Johnson v. Grand Forks County, 16 N. D. 363,

125 Am. St. Rep. 662, 113 N. W. 1071, decided in 1907, and citing Spier v. Baker, 120 Cal. 370, 41 L.R.A. 196, 52 Pac. 659; People ex rel. Ahrens v. English, 139 Ill. 622, 15 L.R.A. 131, 29 N. E. 678; People ex rel. Breckon v. Election Comrs. 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562; Leonard v. Com. 112 Pa. 607, 4 Atl. 220; State ex rel. Adair v. Drexel, 74 Neb. 776, 105 N. W. 174. This court has later, in Johnson v. Grand Forks County, — N. D. —, 135 N. W. 179, during this present year, qualified the holding in the other case of the same title, 16 N. D. 363, 125 Am. St. Rep. 662, 113 N. W. 1071.

We do not hold that the constitutional provisions contained in art. 5 have no application to the primary election law; but we believe that inasmuch as the scheme of elective franchise therein contemplated has classified elections into two classes, general, which is defined, and other elections included within the "any election" provision of § 129, with such elections other than general unclassified and undefined, and with the right to install and put them in operation left to legislative discretion, as is the purpose for which election other than general may be authorized, the legislature is unlimited by said constitutional provisions to the extent that an election for any purpose not unconstitutional may be authorized. And the application of these constitutional provisions to such an election, the purpose of which is within the province of the legislature to determine, must be made with reference to such purpose so as not to unreasonably limit or defeat the purpose of such election when it is plain said constitutional provisions were never intended to be so used or applied if at all. In other words, the purpose must be considered with the constitutional provisions to determine their application, and such election is to be considered unlimited so far as a reasonable construction of said constitutional provisions will permit. But the term "elector," as used in the statute, carries into the statute the constitutional definition of an elector, and with it the constitutional guaranty of the right to vote if otherwise qualified under the statute authorizing the election, and which statute cannot restrict or extend suffrage so but what every elector may under equal conditions have a right to participate and enjoy equal rights with every other elector, including the right of written and secret ballot, so far only as is consistent with the purpose for which the election is held. Applied to the facts the legislature had the right to determine the necessity

for nomination by primary election and provide an election for such purpose. It had the right to provide therein that such election should be carried on within the limits of political parties and make regulations with reference to partisanship of electors entitled otherwise to participate. So long as each and every elector similarly situated was afforded the opportunity, at his option, to conform or not to the statutory requirement of partisanship, a matter dependent wholly upon his frame of mind, his belief, and party principles, no elector is conditionally debarred from participating. The requirement of a partisan belief as a basis for classification of the ballot to be voted, or a condition precedent to the right to participate with an organized political party, is not therefore an additional qualification as a condition precedent to the right to vote, within the meaning of § 121 of the Constitution. Miller v. Schallern, 8 N. D. 395–400, 79 N. W. 865; Perry v. Hackney, 11 N. D. 148–156, 90 N. W. 483; Wagar v. Prindeville, 21 N. D. 245, 130 N. W. 224.

As to respondent's contention that the right of suffrage within the meaning of § 121, forbidding the extending or restricting of the right of suffrage until after submission of the proposition to a vote of the people, here applies, we answer that it does not. Chapter 213 in no wise seeks to restrict the right of suffrage, as it is based upon the premise that every elector has the right to vote; and no class of persons other than constitutional electors are by chap. 213 attempted to be granted the right of suffrage. State ex rel. Tompton v. Denoyer, 6 N. D. 586–600, 72 N. W. 1014.

Another objection urged to § 1 of chap. 213 in question is that it is unconstitutional as discriminatory. Respondent alleges that the act discriminates between claims of naturalized citizens in that it permits the foreign born elector naturalized by court process to vote if otherwise qualified, but excludes from voting that large number of foreign born citizens who were residents of this territory, and who became naturalized by the act of Congress admitting the state into the Union; or naturalized similarly on the admission of other states of the Union while then residents thereof. No provision is made whereby persons so naturalized under act of Congress may make proof of citizenship and right to be enrolled or participate in the primaries if otherwise qualified. This invalidates that portion of the required affidavit read-

ing as follows: "Naturalized or declared his intention in ———— court in ———— county ———— state on ———— 19—, as appears by the naturalization papers exhibited herein." This eliminates the proof of naturalization. As this portion is but an incidental part of the statutory affidavit prescribed, and concerns only a detail thereof regarding which we can presume that the legislature would have enacted the law with it omitted, hence the omission of it will not be such an emasculation of the statute as to require the court to pronounce the entire statute void. With this portion omitted, the statute is as plain, workable, and complete as a piece of legislation as it would be with the naturalization portion included. The balance of the statute is not, therefore, in any particular invalidated by holding, as we do, this particular portion as to naturalization void as discriminatory in that it does not operate alike upon all electors similarly situated.

The same contention is made as to § 3 of the act read in connection with § 2 thereof, respondent urging want of uniformity in application in that the statute by express terms permits the voter becoming twenty-one years of age after the period of enrolment and on or prior to the day of primary election to vote thereat, while the person naturalized within the state by court decree during the same period is not provided for and hence is denied the right to vote. This contention is not sound for two reasons: (1) This law construed in the light of its intent, as apparent from its terms and the object sought to be accomplished, does not exclude such naturalized elector, but does permit him the same privilege as is accorded the native born elector arriving at majority during said period; and (2) under existing Federal statutes no one can be admitted to citizenship during said thirty days' period after registration and before election. As to the first proposition we call attention to the statute: "Any person who was a qualified voter in any election precinct in this state on the day of enrolment and registration provided for in this act, and who failed to have his name enrolled on that day by reason of sickness or unavoidable absence from the election precinct, and who is a qualified voter in said district at the time of the primary hereafter held therein, or who may have become twenty-one years of age after the day of enrolment, may have his name enrolled by the election board on any primary day, upon making oath as provided in the general election law in relation to registration of electors

on election days." This statute must be construed in the light of the intent and the object thereof. To construe it strictly would be impossible, or would render the legislation abortive, because inapt and indefinite language is used throughout these provisions. Frequently the term "on the day of enrolment" is used and that day is designated as the time to which this portion of the statute has reference. A careful reading of the entire statute discloses that there is no day of enrolment. Instead, there is a period during which the assessor has possession of the enrolment books, consisting of from on or about the first Monday in April to their return to the county auditor, indefinitely fixed by the law as "on or before thirty days before each primary election day." This portion of the act also mentions registration provided for in the act, using the words "registration" and "enrolment" interchangeably by providing no registration other than what should probably be termed enrolment as the term is used in connection with elections. Then, again, the act provides that such party failing to have his name enrolled by the assessor, because of absence or nonage, may have same done "upon making oath as provided in the general election law in relation to registration of electors on election days," something for which there is no provision of law whatever. Section 21 of chap. 109, Session Laws of 1907, regarding registration at primary elections, having been declared unconstitutional in Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95, the registration provisions meant by this reference in chap. 213, Session Laws of 1911, to "the general election law in relation to registration of electors on election days," must be §§ 732 to 746, and particularly § 738, Rev. Codes 1905, providing for registration of electors in cities and villages, and the reception of votes on election day on the affidavit to be required by the election board of the elector. We would also call attention to the provision for enrolment on primary election day of those electors not enrolled by reason of their sickness or unavoidable absence "from the *election precinct,* and who is a qualified voter in said *district* at the time of the primary hereinafter held therein," as carelessness in the use of language, to say the least. The words italicized should be transposed. The statute should read, as it evidently means "from the district and who is a qualified voter in said election precinct at the time of the primary hereafter held therein." The enrolment officer

has his assessment district to cover in enrolment matters, hence the district limit.    The voter's qualification is that he be such in said election precinct when the election is held therein, *i. e.*, in the precinct,—not the district.    Again, the statutory phraseology that he "may have his name enrolled by the election board on any primary day" means enrolment on primary election day.    So long as we have legislatures imbued with ideas of the necessity of transplanting statutes from other states into our statute law, as was evidently done in this instance, without regard to or proper consideration of existing statutes, problems of interpretation of statutes will continue to be presented.    The procedure intended must be determined by a liberal construction of the whole statute, otherwise the statute is largely unintelligible, indefinite, contradictory, and inapplicable.    Accordingly we construe §§ 3 and 4 to mean that the new voter becoming such either by naturalization, if possible, or reaching the age of majority during the period intervening after the return of the enrolment books to the auditor, and on or prior to election day, may upon thus becoming a qualified elector, as may also any person not enrolled because of his sickness or unavoidable absence from the assessor district during the period when he could otherwise have been enrolled by the assessor, appear before the election board and take oath provided by § 738, Rev. Codes 1905, that he is a resident elector of such precinct, and thereupon be entitled to vote.    Such a construction is the only reasonable one intended by these loosely drawn and indefinite provisions.    This statute being susceptible of two interpretations, one that will nullify or endanger the whole act, and the other one that will harmonize it with the existing law, our duty is to give it the construction that will uphold the statute.    For a similar interpretation of an election enrolment statute, see Re Duffy, 58 Misc. 1, 110 N. Y. Supp. 54, 125 App. Div. 406, 109 N. Y. Supp. 979.

Conceding, though we do not so construe it, that the statute must be construed as relator contends for, that is, that it does not include an elector who has become such by naturalization during the thirty-day period after the enrolment books have left the hands of the assessors and prior to primary election, we would answer that this legislation was passed presumably with reference to act of Congress of June 29, 1906, § 6, under which naturalization is granted and by the terms

of which "no person shall be naturalized, nor shall any certificate of naturalization be issued by any court within thirty days preceding the holding of any general election within its territorial jurisdiction." [34 Stat. at L. 598, chap. 3592, U. S. Comp. Stat. Supp. 1911, p. 532.] However may be the holdings of the many state courts on primary elections, as to constitutional questions, the Federal statute is by the Federal naturalization bureau interpreted to apply to elections, both general and primary. The Federal statute has reference to the preventing of election abuses in connection with naturalization. The Constitution has application to individual rights of suffrage.

We hold, then, the statute as a whole is not vulnerable to objection on the grounds of its unconstitutionality under any of the specifications strenuously urged against it. To uphold the main contention of relator, urging its unconstitutionality because of its exacting other qualifications of the elector not permitted by the Constitution, or as a restriction of the elector's right of suffrage, or as denying the elector his constitutional right of secrecy of ballot, would be equivalent to holding invalid every primary election statute on our statute books, as all are vulnerable to such attack if the one in question is. To so hold would be equivalent to saying that there can be no party primary election provided unless it be possibly one wherein either all primary ballots of each party participating in the primary be given to the elector from which he shall choose the one he desires to use, or one ballot used upon which are placed under party headings the names of all nominees with the elector having the right to mark the ballot for any political party with the necessity of voting a straight party ticket or be disfranchised by a rejection of the ballot, which latter might be urged as objectionable as a restriction upon the right of suffrage. In any event, either procedure would permit minority party to participate largely in the nominations of the majority party for the purpose of its destruction, as is said by the supreme court of Louisiana, by nominating undesirable candidates, or capturing the party machinery, or foisting upon it objectionable principles. We do not mean to exaggerate the standing to be accorded to political organizations, nor do we mean to minimize the right of suffrage of the individual at primary elections. But the matter of nominations for office has never been regarded as of the great importance to the individual or the state as has the exercise of suffrage in the general elec-

tions. The mere fact of application of the general election machinery, by the Australian ballot, to the matter of nominations, as a matter of protection and greater privilege to the individual, should not lead us to declare the rights of the individual altogether paramount to those of political parties, or so much so that the individual may destroy the party altogether. There is a proper equilibrium to be maintained between the rights of the individual and those of a political party. It was the clear intent of the legislature, by the primary election laws, to establish and maintain it. The writ compelling the auditor to comply with the statute will issue. No costs to be taxed.